[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 11, 2003
THOMAS K. KAHN
CLERK

No. 02-13168

D.C. Docket No. 01-00302-CR-PT-S

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ELMORE ROY ANDERSON,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Northern District of Alabama

_____

**(April 11, 2003)**

Before DUBINA and BLACK, Circuit Judges, and RYSKAMP*, District Judge.

RYSKAMP, District Judge:

_____
        *Honorable Kenneth L. Ryskamp, United States District Judge for the Southern District
of Florida, sitting by designation.

Appellant-defendant Elmore Roy Anderson ("Anderson") appeals his convictions for various violations of federal law. For the reasons that follow, we affirm but remand for further sentencing by the district court.

## I. STATEMENT OF THE CASE

### A. Procedural Background

On July 25, 2001, a grand jury indicted Anderson and two corporate defendants, Bill Harbert International Construction, Inc. ("BHIC") and Bilhar International Establishment f/k/a Harbert International Establishment ("Bilhar"), for conspiracy to violate § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (Count One) and conspiracy to defraud the United States under 18 U.S.C. § 371 (Count Two). Anderson pleaded not guilty to both counts of the indictment. Before trial began, Bilhar negotiated a plea agreement with the government in which Bilhar pleaded guilty to Count One and paid a fine of $54 million. In return, the government dismissed the indictment against BHIC.

Anderson went to trial and the jury found Anderson guilty on both counts. Anderson moved for a judgment of acquittal at the close of the government's case, at the close of all evidence, and after the jury returned its verdict. The district judge denied the motion each time. Anderson was sentenced to thirty-six months

2

of incarceration and was ordered to pay a fine of $25,000. The district court allowed Anderson to remain free pending the outcome of any appeal. Anderson then perfected this appeal.

*B. Factual Background*

Anderson served as president of Bilhar from 1978 to 1996. Bilhar is the foreign affiliate of BHIC, an Alabama corporation whose business consisted primarily of providing support services to the bidding and construction of international projects.

As a result of the Camp David Peace Accords in the late 1970s, the United States agreed to fund construction projects to improve the treatment of drinking and waste water in Egypt. The Egyptian government awarded the projects based on sealed competitive bids from companies prequalified by USAID. In turn, the companies were paid by USAID. The projects included pump stations, pipelines, and wastewater treatment facilities.

Several U.S. companies, including Bilhar, were prequalified to bid on the Egyptian USAID projects. Bilhar and BHIC established a joint partnership with J.A. Jones Construction Co. ("Jones") of North Carolina and was prequalified as a bidder for USAID. A Bill Harbert entity held a controlling share of the joint

venture throughout the prequalification stages.

Three other U.S. companies, ABB SUSA, Inc. ("SUSA"), the George A. Fuller Company ("Fuller"), and Fru-Con Construction, Inc. ("Fru-Con"), also bid on at least one of the three contracts. These companies were either subsidiaries of or wholly owned by foreign co-conspirators. Philipp Holzmann, a German company headquartered in Frankfurt, owned Jones. Peter Schmidt, a prominent leader in the conspiracy, was the supervisor of Holzmann's international operations and a member of its management board. He also supervised Holzmann's subsidiaries such as Jones. ABB ASEA Brown Boveri, Ltd., a Swedish/Swiss company, was the parent company of SUSA. The Archirodon Group, Inc., a Panamanian company, owned Fuller. Bilfinger + Berger BhbH "(B+B)", a German company, was the parent company of Fru-Con.

The prequalified bidders conspired to manipulate the competitive bids on the contracts by designating which company would win the bid in question before the bids were submitted. The bidders also arranged "loser's fees," lucrative subcontracts, or promises of winning future bids for the other bidders. The winning bidder added these costs into its bid. As a result, USAID paid not only an inflated price for the project, but also the loser's fees for the non-prevailing bidders.

4

1.  Contract 20A

In 1988, USAID solicited bids from prequalified bidders to connect a wastewater treatment facility to pumping stations with nineteen kilometers of pipe in Cairo, Egypt. Three entities were prequalified to bid on the project: the Halbert-Jones joint venture, Fru-Con, and Fuller. Prior to the opening of the bids on August 4, 1988, Peter Schmidt contacted Dieter Kadenbach, a member of Fru-Con's supervisory board. Kadenbach met Schmidt at Schmidt's offices in Frankfurt, Germany. Representatives of the other bidders, including Anderson, were also present. Schmidt proposed that the companies rig the bids on Contract 20 to ensure that Halbert-Jones would win the contract. Schmidt contacted Kadenbach several weeks later and sought to work out the details. They agreed that Fru-Con would submit a higher bid than Halbert-Jones. In exchange, Schmidt agreed to pay Fru-Con two to three percent of the price of Contract 20A, or about $2,200,000.

Schmidt also worked out bid rigging agreements with representatives from Fuller, the third qualified bidder on Contract 20A. On August 3, 1988, Gunter Niebergall, a Holzmann employee Schmidt supervised, negotiated the terms of an agreement with Constantine Iatrou, an employee of Archirodon, Fuller's parent company. The agreement provided that Fuller would only serve as a subcontractor

to Harbert-Jones on the project. Holzmann agreed to compensate Fuller for not bidding by either awarding Fuller a $25,000,000 subcontract and paying Archirodon a "fee" equal to three percent of the remaining contract value, or Holzmann would pay Archirodon a five percent "fee" of Contract 20A's value – about $5,000,000. Additionally, Harbert-Jones would not bid against Fuller for future USAID projects of approximately the same value. These details were specifically enumerated in the agreement.

The same day this agreement was signed, a letter was sent on Harbert letterhead to the Contract 20A project owner, Cairo Wastewater Organization (CWO), on behalf of the Harbert-Jones joint venture. The letter informed CWO that Harbert-Jones needed to increase its previously submitted bid by three to five percent due to last-minute price changes and other circumstances.

When the bids were opened, Harbert-Jones' bid of $129.3 million was the low bid. Fru-Con bid $151.8 million and Fuller did not submit a bid at all. Before the bids were opened, engineers for CWO estimated the cost would be about $60 million. Because of the large discrepancy, CWO and USAID engaged in a series of competitive negotiations with Harbert-Jones and Fru-Con and scheduled a second round of best-and-final bids for December 1988.

Prior to the December 1988 bidding, Schmidt met with Iatrou, Anderson,

6

and several others on December 7. They discussed the August 3 agreement and negotiated a lower payoff on the bid-rigging scheme. Anderson wrote down the new agreement and signed it. Schmidt scratched out Anderson's name on the document because he was an "American and this agreement was between European companies." Schmidt and Iatrou signed the document instead.

The companies' revised bids were opened on December 12, 1988. Harbert-Jones was awarded Contract 20A on April 16, 1989. Payment for services on the contract was made directly to Harbert-Jones from the U.S. Treasury. Harbert-Jones made its payments to Fru-Con, Fuller, and Holzmann as they had agreed. When confusion arose as to when the payments between the conspirators were due, Anderson, Schmidt, Iatrou, and others met in Frankfurt, Germany. Iatrou and Schmidt corresponded frequently about the issue, always referring to Anderson in the letters as "our friend" or their "contact in the U.S." Harbert-Jones completed the work on Contract 20A in 1993. The total contract price was $107,071,000. Harbert-Jones earned a profit of $50,639,000 on the project.

2. Contract 07

Contract 07 involved the construction of large sewer tunnels in Alexandria, Egypt. Harbert-Jones was originally the only bidder on the contract, but their bid

was deemed too high by CWO and USAID. Bids were solicited a second time, to be due on November 25, 1990. Two months before the bidding date, Schmidt called a meeting in his Frankfurt offices with Werner Hoffmeister, a representative of Fru-Con's parent company B+B. Anderson also attended the meeting. Schmidt asked Hoffmeister to rig Fru-Con's bid such that Harbert-Jones could win the contract. Hoffmeister told Schmidt that Fru-Con was very interested in competing for the project. Morever, because there was another prequalified bidder, Morrison-Knudson ("MK"), based in Boise, Idaho, there could be no effective agreement unless all three bidders agreed. Schmidt said he would ask Anderson to contact MK. Anderson did not make any response to this request, and Hoffmeister understood that Anderson would follow through with Schmidt's instructions. Two MK representatives testified that Anderson had not discussed with them rigging their bid, but Anderson did take a trip to Boise less than a month before the bidding date of Contract 07. His hotel receipt for the trip shows MK's business address as his contact information.

Two weeks after the Frankfurt meeting, Schmidt called Hoffmeister to inform him that MK would not agree to rig the bids. Schmidt and Hoffmeister therefore agreed to include a loser's fee in their bids such that if either company

8

won the contract, it would pay the other a set sum of money.[1]

At a joint venture meeting prior to the bid date on Contract 07, Anderson told Johnny Ollis, an employee of Harbert-Jones, that Anderson needed room to maneuver in setting the bid. Ollis responded that they still needed to submit a competitive bid. Anderson replied that all the companies were on board and part of the "Frankfurt Club." Holzmann had "set it up," he said. Ollis was distressed by Anderson's comments and changed the subject.

Ultimately, MK submitted a bid on the contract but Fru-Con did not submit one. Harbert-Jones won the bid and paid Fru-Con a reduced lump sum.


3. Contract 29

In 1989, CWO solicited bids for a wastewater treatment project in Egypt referred to as Abu Rawash. The bids were due on July 2, 1989. Prior to the due date, Schmidt contacted Giovanni Greselin, a SUSA supervisor, and requested that Greselin come to Frankfort to discuss construction contracts. Greselin went to Frankfurt knowing that Schmidt would propose a bid-rigging agreement.

At the meeting, Schmidt proposed an arrangement in which Harbert-Jones would bid high on Contract 29 and SUSA would bid high on a project in Europe.

---

[1] Hoffmeister cannot remember whether the sum of 1.5 million was to be in U.S. dollars or German marks.

The parties also agreed that Harbert-Jones would be paid about $3 million in exchange for submitting a higher bid. Greselin indicated that he was interested in the deal but did not have the authority to close the deal.

While Greselin was in Frankfurt, Schmidt introduced him to a representative of Harbert-Jones. At trial, Greselin could not remember or did not know the representative's name. Anderson's own expense reports indicated, however, that he was in Frankfurt about the time of the meeting for "marketing," even though Harbert-Jones had no construction jobs in Frankfurt. Gordon Burles, a Harbert-Jones area manager, kept Anderson informed about the progress of Contract 29, and Anderson himself forwarded correspondence related to the project to Schmidt. A letter from Anderson to the CWO project manager clearly indicated that Harbert, with Anderson as its vice president, was the sponsoring partner of the Harbert-Jones joint venture.

After the meeting concluded, Greselin met with his supervisor Luigi Ruggieri. Greselin showed Ruggieri a handwritten agreement or minutes from the meeting. Ruggieri realized the agreement was illegal and destroyed the document, but nevertheless gave Greselin permission to continue discussions with Schmidt that would allow SUSA to win the contract. Greselin oversaw the completion of the SUSA bid. When the bids were opened, SUSA had indeed submitted a lower

bid than Harbert-Jones and was awarded the contract. Schmidt met with Ruggieri and made arrangements for SUSA's payment to Holzmann of $3.4 million. A Swiss subsidiary of Holzmann sent SUSA an invoice for the $3.4 million, and it was paid within a month. SUSA grossed a profit of more than $58 million on the project. The last payment from the U.S. Treasury to SUSA on the project was dated September 20, 1996.

4. The overarching conspiracy

At trial, the Government's theory of the case was that the three contracts were part of one overarching conspiracy. This theory was essential to the Government's case in order to connect Anderson to the bid rigging schemes on Contracts 20A and 07. The statute of limitations for a claim brought under the Sherman Act is five years, and the final payments on the first two contracts were made by January 18, 1995. The indictment against Anderson was not returned until July 25, 2001. The final payments on Contract 29, however, did not occur until September 20, 1996. Thus, if the three contracts are part of an overarching conspiracy, the last act of the conspiracy did not take place until September 1996, and the indictment would have been timely filed. The jury accepted the Government's argument and convicted Anderson of conspiring to defraud the

11

United States under the Sherman Act (15 U.S.C. § 1) and 18 U.S.C. § 371.

## II. ISSUES

The defendant raises the following issues on appeal:

1. Whether there was sufficient evidence presented at trial to sustain Anderson's convictions.

2. Whether the district court erred in its instruction of the jury concerning jurisdiction.

3. Whether the district court used the proper sentencing guideline in sentencing Anderson.

## III. STANDARDS OF REVIEW

The standard of review for a motion for acquittal based on sufficiency of the evidence is *de novo*. *United States v. Miles*, 290 F.3d 1341, 1355 (11th Cir. 2002). This Court views the evidence "in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." *Id.* The standard of review for a motion for a new trial is abuse of discretion. *United States v. Pendergraft*, 297 F.3d 1198, 1204 (11th Cir. 2002).

This Court reviews *de novo* whether the district court misstated the law when

instructing the jury or misled the jury to the prejudice of the defendant. *United States v. Deleveaux*, 205 F.3d 1292, 1296 (11th Cir. 2000). A court's refusal to give a requested jury instruction is reviewed for abuse of discretion. *United States v. Roberts*, 308 F.3d 1147, 1153 (11th Cir. 2002). "A trial judge's refusal to give a requested instruction will warrant a new trial only if (1) the requested instruction was substantively correct, (2) the court's charge to the jury did not cover the gist of the instruction, and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." *Id.*

A challenge to the application of the sentencing guideline is a mixed question of law and fact. *United States v. Ferreira*, 275 F.3d 1020, 1024 (11th Cir. 2001). This Court reviews the district court's findings of fact for clear error and its application of the sentencing guidelines to those facts *de novo*. *Id.* Additionally, "interpretation of the Sentencing Guidelines is similar to statutory interpretation and is subject to de novo review on appeal." *Id.* (quoting *United States v. Goolsby*, 908 F.2d 861, 863 (11th Cir. 1990)).

## IV. ANALYSIS

### A. Sufficiency of the Evidence

The jury found Anderson guilty of violating the Sherman Antitrust Act

which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations" is illegal. 15 U.S.C. § 1. Anderson was also found guilty of violation of 18 U.S.C. § 371, which provides that individuals may be fined or imprisoned for up to five years, or both, who "conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose" and who "do any act to effect the object of the conspiracy."

Anderson argues that the evidence presented at trial was insufficient to sustain his convictions for four reasons. First, he argues the Government failed to prove the single, overarching conspiracy alleged in the indictment. Second, he alleges that the charges against him are barred by the statute of limitations. Third, he contends that the Government failed to prove he knew of or was connected to any "agreement," an essential element of a conspiracy. Fourth, he avers that the government failed to establish subject matter jurisdiction over the foreign conduct in this case.

1. Evidence of a single, overarching conspiracy

Anderson argues the evidence presented at trial fails to prove a single,

14

overarching conspiracy encompassing the bid-rigging, as alleged in the indictment. He asserts that the negotiations on the contracts were "wholly separate" and that the Government failed to present evidence of rigging or attempting to rig all three bids. The Government responds that the evidence presented at trial was in accord with the allegations of the indictment and that a reasonable jury could have found a single conspiracy on the evidence presented at trial. Two issues are thus before the Court: 1) the substantive aspect of whether the government indeed established a single conspiracy, and 2), the procedural aspect of whether there is a material variance between how Anderson was charged and what the government's evidence established at trial.

Anderson's main argument is that the government's evidence failed to establish and the jury wrongly found a single overarching conspiracy. This Court narrowly reviews this argument: "We may reverse a jury's finding that a single conspiracy existed only if the evidence, viewed in the light most favorable to the government, could not permit reasonable jurors to have found, beyond a reasonable doubt,` that there was a single conspiracy." *United States v. Taylor*, 17 F.3d 333, 337 (11th Cir. 1994) (quoting *United States v. Brito,* 721 F.2d 743, 747 (11th Cir. 1983)). Three relevant factors determine whether a single conspiracy existed: (1) whether there was a common goal, (2) the nature of the scheme, and (3) the overlap

15

of the participants. *U.S. v. Chastain*, 198 F.3d 1338, 1349 (11th Cir. 1999). No material variance exists if a reasonable fact finder could have found the existence of a single conspiracy. *Id.*

We conclude that a reasonable jury could have found a single conspiracy on the facts of this case. First, the common goal of the overarching bid-rigging scheme was to steal from the United States by inflating the winning bids. The written agreement on the first contract, 20A, shows a common goal among the conspirators to reciprocate on future contracts, including Contract 29, the third contract in this case.

Second, Anderson's alleged comments to Johnny Ollis about the "Frankfurt Club" of bidders implies a group of individuals involved in a single enterprise. Additionally, those involved in the scheme by which the bids were rigged worked in a consistent manner on all three contracts. Schmidt contacted the participating pre-approved bidders and arranged a meeting in Frankfurt. The representatives of the bidders agreed which company would win the bid and what the others would receive for bidding high. The bid prices were raised to accommodate the higher anticipated profits as well as the losers' fees.

Finally, although the participants were different in each meeting, there was substantial overlap. Schmidt clearly had a leading role in all three negotiations.

This Circuit permits the finding of a single conspiracy where a "key man" directs the activities, coordinating the individual efforts of various combinations of people. *United States v. Taylor*, 17 F.3d at 337. The jury also had testimonial evidence that Anderson himself was present during the rigging of the bids on all three contracts. Although some of the evidence presented at trial may be less than credible, as Anderson argues, the weight of the evidence considered as a whole is sufficient to support the jury's finding that the bid-rigging scheme was a single, overarching conspiracy.

Because we hold that a reasonable fact finder could have found the existence of a single conspiracy, we necessarily conclude that no material variance existed between the indictment and the evidence presented at trial. *See Chastain*, 198 F.3d at 1349.

2. Statute of limitations issues

The parties agree that the statute of limitations period for a charge brought under both the Sherman Antitrust Act and § 371 is five years. Anderson contends, however, that the charges brought against him were time-barred because the Government failed to prove an overarching conspiracy, and the only purportedly illegal acts (his involvement in Contracts 20A and 07) to which the Government

connected Anderson were completed more than five years before the indictment against him was filed. The final payments on contracts 20A and 07 were made by January 18, 1995. The indictment against Anderson was not returned until July 25, 2001 – more than six and a half years later. The final payments on Contract 29, however, did not occur until September 20, 1996.

As we concluded above, the Government presented sufficient evidence to permit the jury to conclude that the three contracts were part of a single, overarching conspiracy. Anderson was personally involved in the negotiations of the first two contracts, Contracts 20A and 07. Furthermore, contrary to Anderson's assertion, circumstantial evidence indicates that Anderson was in Frankfurt during the negotiations of Contract 29, knew about the negotiations, and agreed with the bid-rigging scheme.

The final payment of Contract 29 was not made until September 1996, within the five year limitations period. Anderson contends that because this payment was not an *overt act* in furtherance of the conspiracy but merely the *result* of the conspiracy, the statute of limitations bars prosecution against him. *See United States v. Doherty*, 867 F.2d 47, 61-62 (1st Cir. 1989). In *Doherty*, however, the "result" of the conspiracy found not to extend the statute of limitations was the receipt of a wrongfully-increased salary. *Id.* at 61. In this case, the final payment

on Contract 29 and the acceptance of that payment was part of the conspiracy to illegally obtain government funds under the contract. *See United States v. Girard*, 744 F.2d 1170, 1172-73 (5th Cir. 1984); *United States v. Walker*, 653 F.2d 1343, 1350 (9th Cir. 1981). The conspiracy continued until the conspirators received the full economic benefits anticipated by their bid-rigging scheme. *Girard*, 744 F.2d at 1172.

Because each of the contracts were part of the bid-rigging conspiracy and the last payment for Contract 29 occurred within the five years prior to Anderson's indictment, the evidence compels the conclusion that the charges against Anderson were not barred by the statute of limitations.

3. Anderson's knowledge of and connection to the agreements

Anderson correctly asserts that an essential element of a conspiracy is that the alleged conspirator knew of and voluntarily participated in the agreement. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864 (1978). Anderson maintains that he did not know of or voluntarily participate in the agreements essential to the conspiracy, and argues that the Government has not proved that he did.

Nevertheless, Anderson's participation in the conspiracies can be established

at least by circumstantial evidence, if not by direct evidence. *See United States v. Lyons*, 53 F.3d 1198, 1201 (11th Cir. 1995). The Government need only prove that Anderson knew the general nature and scope of the conspiracy. *United States v. Clark*, 732 F.2d 1536, 1539 (11th Cir. 1984). Anderson alleges the Government failed to produce sufficient evidence to permit a reasonable fact finder to conclude he knew of the illegal bid-rigging agreements. Because we construe the evidence in the light most favorable to the government and draw all reasonable inferences in its favor, it is difficult for Anderson to establish that he knew nothing of the conspiracy and bid-rigging. The following is an abbreviated list of the evidence presented by the Government suggesting Anderson had knowledge of the illegality of the bid-rigging schemes:

(1)     A letter prepared for Anderson's signature written on August 3, 1988, the same day as the agreement on Contract 20A, raising Harbert-Jones' bid price on the contract, inviting the inference that Anderson knew the bid was being raised pursuant to the illegal agreement;

(2)     Testimony by Mr. Iatrou that Anderson was present and taking part in the discussion at the December 7, 1988 meeting in which the agreement on Contract 20A was discussed and amended and that Anderson wrote down the agreement;

20

(3)     Testimony from witnesses, including Schmidt, that Anderson was Schmidt's contact in the United States;

(4)     Payments pursuant to Contract 20A made from Harbert-Jones accounts, raising the inference that Anderson knew of the transactions and approved their distribution;

(5)     Testimony that Anderson told Johnny Ollis that the agreement on Contract 07 had been set up by the Frankfurt Club, implying that Anderson knew the bidding process had been subverted;

(6)     Anderson's purported presence at numerous meetings at which bids were rigged or agreements were discussed.

While the Government's evidence may not be overwhelmingly persuasive, taken together, it is more than sufficient to permit a reasonable fact finder to conclude Anderson had knowledge of the bid-rigging agreements. Anderson's objection is therefore unfounded.

4. Subject matter jurisdiction

The Sherman Act reaches conduct outside the borders of the United States, but only when the conduct is intended to and does in fact produce a substantial

21

effect on commerce in the United States.[2] *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796, 113 S.Ct. 2891, 2909 (1993). In 1982, Congress enacted the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6(a) (FTAIA), to limit American courts' jurisdiction over international commerce to transactions that affect the American economy. The FTAIA provides that U.S. antitrust law does not apply to non-import foreign commerce unless (1) the conduct has a direct, substantial, and reasonably foreseeable effect on domestic commerce, and (2) the effect gives rise to a claim under the Sherman Act. Anderson contends the court lacked jurisdiction to entertain the Sherman Act charges against him because the activity at question in this case took place in foreign countries and the Government failed to prove that it had a substantial effect on domestic commerce. Anderson relies upon *United States v. Nippon Papers Indus. Co.*, 109 F.3d 1, 6-8 (1st Cir. 1997), for the proposition that his alleged conduct affected only foreign markets, as the structure of USAID is designed to target foreign markets in need of American economic assistance.

Anderson's jurisdictional arguments must be rejected for two reasons. First, the FTAIA does not apply to the facts of this case. On its face, the FTAIA only

---

[2]As Anderson points out, this subject matter jurisdiction argument applies only to his Sherman Act violation, not his § 371 violation. Neither the FTAIA nor *Hartford Fire* apply to § 371.

applies "to conduct involving trade or commerce . . . with foreign nations[.]"  There is no indication Congress intended the FTAIA to apply to government programs such as USAID in which the U.S. government pays U.S. companies who have bid against other U.S. companies to complete construction projects in foreign countries.  Virtually all of the money flowing in a USAID program is between the U.S. government and U.S. companies.  Although the benefit is shared by foreign nations, Anderson fails to articulate how this scheme involves trade or commerce with foreign nations.

Second, even if the FTAIA were to apply, Anderson's conduct had a substantial effect on domestic commerce.  The Government presented considerable evidence that Anderson's scheme intended to have, and actually did have, a substantial effect on domestic commerce.  The bid-rigging scheme took money from the federal treasury, depriving other projects and services of money.  Key decisions and agreements were made at corporate headquarters across the United States, including Alabama (Harbert) and North Carolina (Jones).  Federal money was deposited in Harbert's accounts at SouthTrust Bank in Alabama.  Harbert-Jones made payments to other conspirators out of this same account.  The contracts provided that the equipment and materials used to complete the construction projects must be, and they were indeed, purchased in the United States.  The

equipment and materials were shipped from New Orleans on American freighters. Taken as a whole, the bid-rigging scheme in which Anderson participated relied upon and substantially affected domestic commerce. For these reasons, Anderson's subject matter jurisdiction objection must fail.

### B. Jury Instruction on Jurisdiction

As noted above, some acts of the defendants occurred in foreign countries with an effect upon U.S. commerce and some acts occurred in this country. The jury should have been, and was, instructed on both contingencies.

Anderson argues both that an erroneous charge was given and that a proper charge was refused. A refusal to give a requested instruction is reversible if "the requested instruction '(1) was correct, (2) was not substantially covered by the court's charge to the jury, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense.'" *United States v. Morris*, 20 F.3d 1111, 1115-6 (11th Cir. 1994). Generally, however, district courts are granted broad discretion to formulate jury instructions as long as the jury charge as a whole correctly applies the law and states the facts. *See United States v. Moore*, 253 F.3d 607, 609 (11th Cir. 2001). This Court "will not reverse a conviction on the basis of a jury charge

unless the issues of law were presented inaccurately, or the charge improperly guided the jury in a substantial way as to violate due process." *Id.* Although the jury instruction in this case was not a model of clarity, it did not violate Anderson's due process rights.

The first part of the jury instructions on the Sherman Act count was a standard charge appropriate in domestic antitrust cases. Anderson contends this charge was incorrect because this case involved wholly foreign conduct, not the domestic conduct ordinarily found in Sherman Act cases. As discussed above, we reject this contention. The Government presented substantial evidence of domestic conduct in the alleged conspiracy. By targeting a USAID program as the object of the conspiracy, the conspirators virtually ensured conspiratorial conduct would take place in the United States. The standard Sherman Act jury instruction was therefore proper.

The district court added only the first sentence of Anderson's proposed jury instruction onto the standard Sherman Act instruction. Anderson's proposed instruction was a confusing amalgam of rules and principles derived from various circuit and Supreme Court cases, especially the First Circuit's decision in *Nippon Paper*. The court gave the first sentence of Anderson's proposed instruction, "I further instruct you that the Sherman Act applies to foreign conduct if and only if

that conduct was meant to produce and did, in fact, produce some substantial effect upon trade or commerce in the United States." This sentence instructed the jury in accordance with *Nippon Paper* where all the conduct was foreign. We conclude that this instruction was not unduly confusing. It was reasonable for the district judge to instruct the jury as to two theories of the case: (1) the conduct was domestic, so the *Hartford Fire* rules apply, or (2) the conduct was entirely foreign, so the *Nippon Paper* rules apply. The jury's finding could have been based on either theory, as both were supported by the evidence. Furthermore, the district court properly rejected the remainder of Anderson's proposed jury instructions because they were legally erroneous. The jury instructions given by the district court were not hopelessly confusing, and certainly did not violate Anderson's due process rights.

## C. Sentencing Issues

Anderson objects to the court's application of the Sentencing Guidelines on two grounds. First, he contends the court improperly applied USSG § 2F1.1 rather than § 2R1.1 to calculate his sentence for Count Two. Second, he contends the court should have considered a heartland departure under 18 U.S.C. § 3553(a) based on the totality of the circumstances.

1.  Proper guideline for count two

Both parties agree that § 2X1.1 was the proper starting point for analyzing Count Two. Section 2X1.1 is the general attempt, solicitation, or conspiracy guideline, and it provides that the base offense level from the guideline should be applied for the substantive offense. Anderson and the Government disagree, however, whether § 2F1.1 or § 2R1.1 is the proper guideline for the substantive offense.

The district court determined Anderson's sentence by grouping Count One (Sherman Act) and Count Two (§ 371) under USSG § 3D1.2. The court then applied § 2F1.1 (1995)[3], granted a downward departure pursuant to Application Note 13, and imposed a sentence of 36 months. Anderson argues the court erred by applying § 2F1.1, the fraud guideline, rather than § 2R1.1, the bid rigging guideline. The Government responds that the district court chose the proper guideline for two reasons: first, § 2X1.1 guides the court to § 2F1.1, and second, bid rigging was merely a means to commit fraud here, not the object of the conspiracy itself.

Anderson asserts that § 2F1.1 applies to the first part of 18 U.S.C § 371, in

---

[3] Section 2F1.1 was deleted and consolidated in § 2B1.1 in 2001, prior to sentencing in this case. The parties consented, however, to the use of the 1995 Guidelines, in which § 2F1.1 stood by itself.

which the Government must prove an agreement to commit a separate substantive offense, but not to the second part, which simply makes it a crime to conspire to defraud the United States. Because Anderson was prosecuted under the second part, he argues § 2F1.1 should not apply. This is a torturous reading of the guidelines. Anderson fails to establish that the Sentencing Commission intended to distinguish between the two parts of § 371. If they intended to do so, they would have made their intent clear. Because they did not do so, we must assume § 2F1.1 applies to both parts of § 371. Furthermore, § 2X1.1(c) does not require the use of § 2R1.1 in this case because § 2R1.1 is not listed in Application Note 1 as a guideline that expressly covers conspiracy. The substantive offense in this case was fraud, so § 2F1.1 applies.[4]

There is no question Anderson engaged in bid rigging. There is also no question the purpose of the bid rigging was to defraud the Government. Anderson fails to make a compelling argument why the Government must charge him with fraud and gain a conviction for fraud in order for § 2F1.1 to apply. The conviction in this case assumes Anderson committed fraud. Bid-rigging was merely a means to an end. Anderson relies on *United States v. Rubin*, 999 F.2d 194, 196-97 (7th

---

[4]At the very least, we can conclude § 2F1.1 and § 2R1.1 equally apply to the conduct in this case. In such an event, we apply the provision that results in the greater offense level. USSG § 1B1.1 App. Note 5. In this case, § 2F1.1 results in a greater offense level that § 2R1.1.

Cir. 1993), for the proposition that where the fraud and the anti-competitive activity are inseparable (i.e, the purpose of the fraud was merely to conceal the anti-competitive activity), § 2F1.1 should not apply. Anderson mistakes the purpose of the fraud in this case. Unlike *Rubin*, the purpose of Anderson's bid rigging was to commit fraud. The object was fraud, not bid-rigging. Section 2F1.1 was the proper guideline to apply.

2. Propriety of a heartland departure

During the sentencing phase of Anderson's trial, the district judge made two comments at sentencing regarding Anderson's motion for a departure under 18 U.S.C. § 3553(a). First, the judge said he did not think a prima facie case had been made for a departure. If no prima facia case were made for a departure, the court's denial of the departure would not be reviewable. *United States v. Brenson*, 104 F.3d 1267, 1286-87 (11th Cir. 1997). Second, the district judge said he lacked the authority to grant such a departure. This statement opens the door to appellate review. *United States v. Chase*, 174 F.3d 1193, 1195 (11th Cir. 1999). Anderson argues that the district court could have granted such a departure and requests that this court do so. The Government, while acknowledging the judge erred in concluding he lacked the authority to depart, believes the error was harmless

29

because the facts of this case provide no valid basis for a heartland departure.

A defendant may not ordinarily appeal a district court's refusal to grant a downward departure. *U.S. v. Webb*, 139 F.3d 1390, 1394 (11th Cir. 1998). Where the court erroneously believed that it lacked the authority to grant the downward departure, however, the defendant may appeal the court's failure to downward depart. *Id*. Here, the government concedes that the district judge erroneously found that he did not have the authority to grant a downward departure. Anderson would like this court to settle the matter and determine not only that the district court had the authority to grant a downward departure, but also to order that a downward departure should be given. This we will not do. While we conclude that the district court erroneously believed it lacked the discretion to depart downward in this instance, we express no view as to whether a downward departure should in this instance be granted. *See id*. at 1396. We instead hold that the district court may exercise its discretion to decide whether a departure is warranted with respect to Anderson and remand this cause for this purpose.

## V. CONCLUSION

With the exception of the sentencing issue, all of the issues presented by Anderson in his appeal are without merit. Accordingly, Anderson's convictions are

affirmed, but we conclude that the district judge erred when he found that he did not have the authority to give a downward departure.  AFFIRMED IN PART and REMANDED.