[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 2, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-12614
_____

D.C. Docket No. 01-00765-CR-CC-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DERRICK WHITE, a.k.a. Earnest Wilborn, Jr.,
a.k.a. Zachary Jones, etc.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(July 2, 2003)**

Before EDMONDSON, Chief Judge, KRAVITCH and GIBSON[*], Circuit Judges.

_____

[*] Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

KRAVITCH, Circuit Judge:

Defendant-appellant Derrick White appeals his sentence for being in the United States illegally. White argues that the district court misapplied the term "relevant conduct" pursuant to United States Sentencing Guideline ("U.S.S.G.") § 4A1.2 in calculating his criminal history. Resolving this issue requires us to determine the proper standard for reviewing a district court's application of the Sentencing Guidelines to the facts.

I.    BACKGROUND

The Douglasville Police Department arrested Derrick White in early 2001 for violating Georgia drug laws. White told the officers that his name was "Earnest Wilborn, Jr." The Douglasville Police took White's fingerprints and sent them to the Law Enforcement Support Center, which receives FBI criminal histories on foreign-born persons arrested in the United States. The Douglasville Police then released White on bond.

Upon discovering that "Wilborn's" fingerprints and alien registration number matched White's, the United States Immigration and Naturalization Service (the "INS") investigated White's case for illegal re-entry. INS agents obtained a federal warrant and asked the DeKalb County Police Department to help them execute the

warrant. On July 9, 2001 INS agents went to White's residence, and when White left his apartment, the INS agents approached him and identified themselves. He refused to talk, and the INS agents detained him until the DeKalb County officers arrived. After the DeKalb County officers arrived, one of them asked White for his name, and White responded that his name was "Wilborn." The officer immediately arrested White for giving a false name to a police officer. The INS searched White's apartment and found a fake driver's license in the name of "Earnest Wilborn, Jr." White was charged in state court with forgery and with giving false information to the police; the state prosecutor dismissed the forgery charge when, without the assistance of counsel, White pleaded guilty to giving the police false information. White was sentenced on October 2, 2001 to the eighty-three days' imprisonment he had already served.

Immediately after White received his state sentence, INS agents took him into federal custody and interrogated him. White admitted that his name was "Derrick White" and that he had been deported in 1987 and again in 1991. Both deportations followed convictions for drug trafficking, which is an aggravated felony. Because the U.S. Attorney General had not consented to White's re-entries following the deportations, the federal government charged White with being found in this country after deportation following conviction for an aggravated felony, which the

3

government claimed was a violation of 8 U.S.C. § 1326(b)(2).[1] White entered a non-negotiated guilty plea on February 8, 2002.

Before the sentencing hearing, the probation officer prepared a presentence investigation report (the "PSI Report"), in which she assessed five criminal-history points, two of which were for the false-information sentence. This calculation placed White in criminal-history category III; he would have been classified in category II but for the inclusion of the false-information sentence. White objected to the PSI Report's inclusion of this previous sentence.

At the sentencing hearing, White again objected to the assessment of two criminal-history points for the state false-information sentence, arguing that the conduct underlying this conviction was part of the instant §1326 offense and that the two additional criminal-history points should not be assigned. The sentencing court ruled against White, applying U.S.S.G. § 4A1.2 and holding that the false-information conviction arose from "separate conduct."

White raises a second ground for challenging the assessment of the two

_____

[1] Title 8 U.S.C. § 1326(a) identifies three separate offenses: entering the U.S. illegally, attempting to enter the U.S. illegally, and being found in the U.S. illegally. Section 1326(b)(2) provides that aliens "whose removal was subsequent to a conviction for commission of an aggravated felony . . . shall be fined under such Title, imprisoned not more than 20 years, or both." The indictment charges White with "being found in the U.S." in violation of § 1326(b). Although the judgment and PSI Report indicate that White's conviction was for "entering the U.S.," both parties conceded at oral argument that White's crime was for being found illegally in the United States on July 9, 2001. Accordingly, we assume that White's offense was for being found illegally in the United States on July 9, 2001 in violation of 8 U.S.C. § 1326(a).

4

criminal-history points for the false-information sentence—namely, that the false-information conviction was the result of an uncounseled plea. White's counsel, however, did not object in the district court to the government's use of the uncounseled plea.

There are thus two issues on appeal: first, whether the district court erred in assessing two criminal-history points for White's false-information sentence on the ground that giving false information to the police was part of the instant federal offense; and second, whether the district court plainly erred when it relied on an uncounseled guilty plea in calculating White's criminal history.

## II.  WHETHER FALSE-INFORMATION SENTENCE WAS A "PRIOR SENTENCE" UNDER THE SENTENCING GUIDELINES

Section 4A1.1 of the United States Sentencing Guidelines assigns a certain number of points for a defendant's "prior sentences." The type of crime and the length of a defendant's prior sentence affect the number of criminal-history points assigned to each "prior sentence." A court calculates the defendant's criminal-history category by totaling all of the defendant's criminal-history points. U.S.S.G. § 4A1.1 and comment.

Here, White received two criminal-history points pursuant to U.S.S.G. § 4A1.1(b) for the state false-information sentence, which placed him in criminal-

history category III rather than in category II. Had the sentencing court not counted the two points for the false-information sentence, White may have received a shorter sentence than his current 18-month sentence.[2] White argues that the sentencing court should not have counted his state false-information sentence as a "prior sentence" when it calculated his criminal-history category.

"The term 'prior sentence' means any sentence previously imposed upon adjudication for guilt . . . for conduct not part of the instant offense." U.S.S.G. § 4A1.2(a)(1). "Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct)." U.S.S.G. § 4A1.2 comment. (n.1). In turn, "relevant conduct" includes, *inter alia*, "all acts and omissions committed . . . by the defendant that occurred during the commission of the offense of conviction, in preparation for that offense, or *in the course of attempting to avoid detection or responsibility for that offense . . . .*" U.S.S.G. § 1B1.3(a)(1) (emphasis added). This court has never defined what conduct constitutes "an action taken to avoid detection or responsibility for" an offense under U.S.S.G. § 1B1.3(a)(1), nor, until now, have we prescribed the proper standard for reviewing a district court's application of U.S.S.G. § 4A1.2 and § 1B1.3(a)(1) to the facts in light of Buford v. United States, 532 U.S. 59 (2001).

---

[2] In White's case, a category III criminal history prescribes a sentencing range between 18 and 24 months, whereas a category II classification prescribes one between 15 and 21 months.

*A.	Standard of Review*

Congress has prescribed three standards for reviewing a district court's use of the Sentencing Guidelines: appellate courts are to review purely legal questions *de novo*, a district court's factual findings for clear error, and, in most cases,[3] a district court's application of the Guidelines to the facts with "due deference." See 18 U.S.C. § 3742(e); see also Buford v. United States, 532 U.S. 59, 63 (2001). Yet, despite the instruction in 18 U.S.C. § 3742(e), confusion exists concerning the proper standard for reviewing a district court's application of the Sentencing Guidelines to the facts. Compare, e.g., United States v. Saavedra, 148 F.3d 1311, 1313 (11th Cir. 1998) ("We review *de novo* the district court's application of the Sentencing Guidelines to a given set of facts.") and United States v. Anderson, 326 F.3d 1319, 1326 (11th Cir. 2003) ("This Court reviews the district court's findings of fact for clear error and its application of the sentencing guidelines to those facts *de novo*."), with United States v. Hunter, 323 F.3d 1314, 1322 (11th Cir. 2003) ("We review for clear error the finding that prior convictions are unrelated under § 4A1.2."). Hunter is a recent

---

[3] The PROTECT Act of 2003, Pub. L. No. 108-21, 117 Stat. 650, amended 18 U.S.C. § 3742(e), thereby changing the standard of review for certain cases in which a district court has applied a sentence outside the applicable guideline range. Nevertheless, because our review falls under subsection (e)(2) of § 3742 rather than subsection (e)(3), the PROTECT Act's amendments do not change the standard of review in this case.

Eleventh Circuit decision about the Sentencing Guidelines' concept of "relatedness," and Saavedra and Anderson prescribe the standard for reviewing a district court's application of the Guidelines to the facts. None of these cases, however, has considered the effect of Buford v. United States, 532 U.S. 59 (2001), on our standard-of-review analysis in cases involving the application of the Sentencing Guidelines.

Buford involved a bank robber who received a career-offender enhancement to her sentence pursuant to U.S.S.G. § 4B1.1. Applying § 4A1.2, which instructs a sentencing court to count "related offenses" as a single offense, the district court ruled that one of Buford's five prior convictions was not "functionally consolidated" with—and hence not "related" to—the other four convictions. Id. at 61–62. On appeal, the Seventh Circuit characterized the district court's decision about whether the convictions were "related" and "consolidated" as follows:

> We have . . . a classic mixed issue, where the [district court applied] legal norms to classify the facts. And disputes about the proper characterization of events, when legal norms guide rather than determine the answer, are principally committed to district courts, with deferential appellate review. . . . Questions concerning application of the Guidelines generally are reviewed deferentially, unless the district court makes an identifiable legal mistake . . . .

United Stated v. Buford, 201 F.3d 937, 941–42 (7th Cir. 2000) (internal citation omitted). Accordingly, the Seventh Circuit reviewed the district court's application

of the Guidelines for clear error and affirmed the district court's decision.

The Supreme Court affirmed the Seventh Circuit's standard of review, explaining that appellate courts must give "due deference" to a district court's application of a "Sentencing Guidelines term" to the facts. Buford v. United States, 532 U.S. 59, 63–64 (2001). The Court explained that the "deference that is due depends on the nature of the question presented." Id. at 63 (quoting Koon v. United States, 518 U.S. 81, 98 (1996)). The Court did not explicitly prescribe a clear-error standard for reviewing a district court's application of §§ 4A1.2, 4B1.1, and 4B1.2. Nevertheless, the Court stated, "In light of the fact-bound nature of the legal decision, the comparatively greater expertise of the District Court [at sentencing], and the limited value of uniform court of appeals precedent, we conclude that the Court of Appeals properly reviewed the District Court's 'functional consolidation' decision deferentially." Buford, 532 U.S. at 66.

Reading our recent decision in Hunter in light of Buford, a district court's determination that multiple convictions are "related" is not a factual finding; rather, it is a determination reached by applying the Sentencing Guidelines to the facts of a case. Therefore, following Buford, we must give "due deference" to a district court's application of the Guidelines to the facts.

Deciding to give "due deference" to the district court's application of § 4A1.2(a)

9

(the phrases "conduct not part of the instant offense" and "[p]rior sentences imposed in unrelated cases") and § 1B1.3(a)(1) (the phrase "acts and omissions committed . . . in the course of attempting to avoid detection or responsibility for that offense") does not end the standard-of-review inquiry. The Supreme Court did not define deferential review in <u>Buford</u>, so we must decide what deference is due in this case.[4] Although the circuit courts of appeals have used varying standards to review district courts' applications of the Guidelines,[5] we will review the district court's application of § 4A1.2 and § 1B1.3(a)(1) to the facts for clear error.

Deciding whether an act was committed "in the course of attempting to avoid detection or responsibility for [an] offense" is almost always a question of fact. It requires the sentencing judge to assess the defendant's intent for committing the additional crime. Because a district court has a "detailed understanding of the case

---

[4] The Supreme Court did not indicate whether appellate courts should determine "what kind of 'deference' is 'due,'" <u>Buford v. United States</u>, 532 U.S. 59, 63 (2001), based on the facts of each particular case or whether courts should assign the appropriate standard of review according to the particular Guidelines section applied by the district court.

[5] <u>See, e.g.</u>, <u>United States v. Thomas</u>, 327 F.3d 253, 257 (3d Cir. 2003) (applying clear-error review); <u>United States v. Goodwin</u>, 317 F.3d 293, 297 (D.C. Cir. 2003) (describing "due deference" as an "intermediate standard" between *de novo* and clear-error review); <u>United States v. Zats</u>, 298 F.3d 182, 185 (3d Cir. 2002) (applying clear-error review); <u>United States v. Jackson-Randolph</u>, 282 F.3d 369, 390 (6th Cir. 2002) (applying clear-error review); <u>United States v. Paul</u>, 274 F.3d 155, 162 (5th Cir. 2001) (applying "a deferential standard of review"); <u>United States v. Lewis</u>, No. 00-4313, 2001 WL 789063, at *5 (4th Cir. 2001) (per curiam) (explaining that the reviewing court will apply clear-error review to mixed questions that are essentially factual and *de novo* review if the mixed question requires consideration of legal concepts and requires the court to "exercise judgment about the values that animate legal principles").

before it" and greater experience in sentencing defendants, Buford, 532 U.S. at 65, it is generally better suited to determine whether the additional crime was committed "in the course of attempting to avoid detection or responsibility for [an] offense." Accordingly, clear-error review is appropriate in this case.[6]

*B.    Application*

Because we apply the clear-error standard, the question presented is whether the district court clearly erred when it concluded that White's giving a false name to a police officer was not an act taken "in the course of attempting to avoid detection or responsibility" for the offense of illegally being in the United States. Applying this standard, "[w]e will not find clear error unless our review of the record leaves us 'with the definite and firm conviction that a mistake has been committed.'" Coggin v. Commissioner, 71 F.3d 855, 860 (11th Cir. 1996) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)). Nevertheless, that high standard is met in this case.

At White's sentencing hearing, the district judge briefly discussed his reason for deciding that the state false-information conviction was not related to the federal

---

[6] We note, however, that White pleaded guilty to the federal offense and that, as a consequence, the sentencing judge did not possess the same level of familiarity with the facts and with White that he would have had if White's case had gone to trial.

offense of being in the United States illegally. He stated that he would "resolve this issue in favor of the government and against the defendant because of the factual situation as relates to the two state charges. It appears . . . that the INS had gone to arrest the defendant for being illegally in this country and while arresting the defendant, the defendant then gave a false name and subsequently the government searched his apartment and obtained a false I.D. which was the same as the false name that the defendant had given to the government. So, therefore, the conduct is not relevant and is separate."[7]

The district court's explanation for ruling that the offenses were unrelated is merely a chronology of what happened. These observations do not allow us to make any inferences about White's intent, which is the relevant inquiry in deciding whether the state false-information crime was an attempt to avoid detection for the federal crime. Furthermore, we are not persuaded by the government's argument in support of the district court. The government contends, "These two offenses arose from different courses of actions."[8] The principal basis for this claim is that White violated § 1326 when he entered the U.S. and that "[h]is decision, once in the United States, to live under [a different name] is a different issue." This argument would be convincing

---

[7] R. 2:13:22–24 and 2:14:2–9.

[8] Appellant's br. at 9.

if the government had in fact indicted White of *entering* the U.S. in violation of § 1326(a), whereas the false statement to the officer occurred on July 9, 2001 in DeKalb County, Georgia—a place far from the border and at a time months after White's entry into the United States. The problem is that the government charged White with "being in" the United States in violation of § 1326(b),[9] and, in many circumstances, giving false information to a police officer could constitute an action taken to avoid detection for this offense. For this reason, the relevant inquiry is whether, in this particular case, White lied to the police officers in order to avoid detection for being in the United States.

The facts are undisputed: White had been deported previously, and when he returned to and remained in the United States illegally, he assumed several aliases. On the day of the arrest, the INS agents first identified themselves to White, but White refused to give them his name. When the DeKalb County officers arrived, but still in the presence of the INS agents, White gave the false name.

White's arguments about the relevancy of these facts are convincing. He maintains that if "he had given his true identity, his crime of being illegally in the United States . . . would have been readily discovered"—and not only by the local

---

[9] Additionally, during the sentencing hearing on this very matter, the government's attorney conceded that "what [White] is charged with is the simple fact that his body is in the United States and it is here illegally." R. 2:8:7–8.

13

officers but by the INS agents responsible for enforcing § 1326.[10]  The fact that he initially refused to give his real name to the INS agents is strong evidence that he gave a false name to avoid detection for violating federal immigration laws.  Additionally, White argues that it is common knowledge that illegal aliens frequently assume false identities in order to hide their illegal status from law-enforcement officials and employers, and he claims that his own long-term use of aliases, and his use of a fake driver's license, was part of a concentrated effort to avoid detection for being in the United States illegally.

Admittedly, White's aliases may have prevented law-enforcement officials from linking him to other crimes, but, given the undisputed facts of White's encounter with the INS officers, there is little doubt that White gave a false name "to avoid detection or responsibility for [the federal] offense."  Therefore, we conclude that the district court clearly erred when it assessed two criminal-history points for the state false-information conviction.

Because we resolve this issue in White's favor, we need not address whether the uncounseled false-information conviction was presumptively void for purposes of calculating White's criminal history.

---

[10] Appellant's br. at 9.

III.    CONCLUSION

For the reasons stated, we VACATE White's sentence and REMAND the case for resentencing consistent with this opinion.