**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-10954

————————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

JAMAR BRANDON NATTIEL,
  a.k.a. D-Boy,
  a.k.a. Debo,
PALACIO VALDES FARLEY,
  a.k.a. Bobo,
  a.k.a. Bo,
JOASSAINT JOSIAH ARISTIL, JR.,
  a.k.a. JoJo,

*Defendants-Appellants.*

————————————————

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:22-cr-20556-RKA-5

————————————————

Before JILL PRYOR, LUCK, and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, defendants Palacio Farley, Joassaint Aristil, Jr., and Jamar Nattiel appeal their convictions on a single count of conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a). Collectively, the defendants challenge (1) the denials of their motions to dismiss the indictment; (2) the denial of Palacio Farley's motion to suppress the photo lineup identifications; (3) the admission of a robbery in Daytona Beach as Rule 404(b) evidence; (4) the admission of Palacio Farley's threat against witness Lisa Flood as Rule 404(b) evidence; and (5) the denials of their Rule 29 motions for a judgment of acquittal.

After review of the extensive record and the parties' briefs, and with the benefit of oral argument, we affirm the defendants' convictions.

## I. PROCEDURAL HISTORY

On November 16, 2022, a grand jury in the Southern District of Florida indicted Palacio Farley and five of his co-conspirators on a single count of conspiracy to commit robbery in violation of 18 U.S.C. § 1951(a) ("Hobbs Act robbery"). The defendants included (1) Palacio Farley; (2) Andrew Martin; (3) Karen Williams; (4) Lisa Flood; (5) Joassaint Aristil, Jr.; and (6) Jamar Nattiel.

Andrew Martin ("Martin"), Karen Williams ("Williams"), and Lisa Flood ("Flood") pled guilty. Defendants Palacio Farley

("Farley"), Joassaint Aristil, Jr. ("Aristil"), and Jamar Nattiel ("Nattiel") proceeded to trial and are parties to this appeal.

## A.    The Indictment

After naming the six defendants, the indictment charged a conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951 and tracked the statutory language of § 1951 as follows:

> [Defendants] did knowingly and willfully combine, conspire, confederate and agree with one another, and with other persons known and unknown to the Grand Jury, to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by means of robbery, as the terms "robbery" and "commerce" are defined in Title 18, United States Code, Section 1951(b)(1) and (b)(3).

The indictment included a more particularized description of the conspiracy and its object by charging that the defendants unlawfully planned to "take controlled substances, United States currency, jewelry, and other property, from persons and in the presence of persons engaged in commerce, against the will of those persons, by means of actual and threatened force, violence, and fear of injury to said persons, in violation of Title 18, United States Code, Section 1951(a)." The indictment charged that the unlawful conduct took place "on or about May 22, 2016, through on or about December 11, 2017, in Miami-Dade County . . . ."

## B.    Defendants' Motions to Dismiss the Indictment

Defendant Nattiel filed a motion to dismiss the indictment, which defendants Aristil and Farley joined. The motion argued the indictment was so vague that it (1) would not allow the defendants to plead double jeopardy in a subsequent prosecution for the same offense; and (2) could allow a jury to return a guilty verdict on non-unanimous findings. The government opposed the motion.

Ultimately, the district court denied the defendants' motion to dismiss the indictment.

## C.    Farley's Separate Motion to Dismiss

Defendant Farley also filed a separate motion to dismiss the indictment, this time arguing that his prosecution for conspiracy to commit Hobbs Act robbery was barred by the Double Jeopardy Clause of the Fifth Amendment. Farley was already convicted and sentenced for (1) conspiracy to possess with intent to distribute controlled substances; and (2) conspiracy to commit money laundering. *See United States v. Farley*, No. 19-CR-20667 (S.D. Fla. sentenced July 28, 2022). Farley argued that the Hobbs Act robbery conspiracy charged in this case and his prior drug conspiracy conviction involved overlapping facts and conspirators, meaning the two conspiracies "were not separate conspiracies, but smaller parts of one overarching conspiracy."

In response, the government argued this Hobbs Act robbery conspiracy and Farley's prior drug conspiracy conviction constituted two separate offenses under the *"Blockburger* test." *See Blockburger v. United States*, 284 U.S. 299, 304 (1932). The

government cited this Court's decision in *United States v. Cannon*, which held conspiracy to possess with intent to distribute (21 U.S.C. § 846) and conspiracy to commit Hobbs Act robbery (18 U.S.C. § 1951(a)) had separate elements and could be charged as two separate offenses consistent with the Double Jeopardy Clause. *See United States v. Cannon*, 987 F.3d 924, 940 (11th Cir. 2021).

The district court denied Farley's motion based on *Blockburger* and *Cannon*. After ruling on other pre-trial motions, the district court conducted a ten-day jury trial.

## II.  EVIDENCE AT TRIAL

The trial evidence showed that Farley was the leader of a scheme (1) to rob drug traffickers of their illicit inventory (mostly marijuana), and (2) then sell the stolen drugs. Farley compared himself to a chess player moving pawns on his chess board. Farley used his co-defendants and others as pawns.

Farley's co-conspirators were no strangers—they engaged in sexual relationships amongst each other and referred to one another in familial terms. For example, Farley had a sexual relationship with both Flood and Williams. Aristil had a "complicated" romantic relationship with unindicted co-conspirator Shanequa Samuels ("Samuels"), who testified at trial. Farley and Williams called Martin their "son," while Samuels called Williams "mother." These relationships were fostered by the fact that the group—at least Farley, Williams, Samuels, and Flood—often co-habitated.

The evidence of the charged Hobbs Act conspiracy centered on two robberies, referred to as (1) the "Van Nuys robbery" and (2) the "Keane robbery." As Rule 404(b) evidence, the government also introduced evidence of a third robbery, the "Daytona Beach robbery," to demonstrate Farley's intent and relationship with his co-conspirators.

The government called twenty-six witnesses. The victims of the robberies testified, including William Merle, Vladimir Gutierrez, Yanetsi Cordova, Stephen Keane, and Nancy Keane.

Unindicted co-conspirator Samuels testified. Samuels described the planning and execution of the Keane robbery. She also testified regarding assistance she provided to Farley in the aftermath of the Daytona Beach robbery.

Flood, a co-defendant who pled guilty in this case, testified regarding the Keane robbery and the events following the Daytona Beach robbery. The jury also heard testimony that Farley threatened Flood before she took the witness stand at trial for a second consecutive day.

Numerous law enforcement officers, airline employees, and other individuals were called to describe investigations, authenticate evidence, and fill in gaps in the government's narrative of the case. The defendants did not call any witnesses. The evidence, viewed in the light most favorable to the government, showed as follows.

## A.    May 24, 2016: The Van Nuys Robbery

In the Van Nuys robbery, defendant Farley, co-defendant Martin, and an unindicted co-conspirator robbed two drug traffickers—William Merle and Justin Ziegler—in Van Nuys, California. Farley and Martin posed as prospective buyers of Merle's and Ziegler's drugs. According to Merle's trial testimony, here's how Farley and company robbed Merle and Ziegler.

In 2015, Merle and Ziegler began trafficking marijuana together. By May 2016, Merle was selling Ziegler marijuana by the pound in weekly or bi-weekly wholesale transactions. Ziegler frequently acted as a middleman to arrange purchases for Merle.

On May 24, 2016, Merle, a resident of Los Angeles, traveled to Ziegler's apartment in Van Nuys, California, with twenty-five pounds of marijuana. Ziegler had arranged for buyers to purchase the twenty-five pounds of marijuana for $1,500 a pound—the largest order Ziegler had ever arranged for Merle. Merle had no prior relationship with the buyers expected on May 24, but he knew the buyers had previously purchased several pounds of marijuana from Ziegler.

When Merle arrived at the May 24 meeting, he took half of the order—around twelve pounds of marijuana—into Ziegler's apartment. Merle had packaged the marijuana in one-pound, vacuum-sealed bags, which were all placed into a duffle bag for transport. Upon his entry into the apartment, Merle greeted the two buyers, whom he described as two black men, one larger and the other slim.

Merle opened two bags containing different strains of marijuana so that the buyers could inspect his product. Discussion of the transaction's terms ensued, during which Merle rejected the buyers' requests that he sell the marijuana on credit.

When all present had reached an agreement, the larger buyer departed and stated that he was going to retrieve his money to complete the purchase. The second buyer remained in the apartment. After five to ten minutes, the larger buyer returned. Instead of having cash in hand, however, the larger buyer opened the door and stepped aside to reveal a third person, who immediately raised a firearm and began shooting at Merle.

In the first volley of shots, Merle was hit in his arm. Merle charged the gunman and, in the ensuing wrestling, Merle was shot in his back, armpit, and elbow. In his testimony, Merle recounted his belief that the smaller buyer who had remained in the apartment drew a sawed-off shotgun and shot him in the side. Merle eventually wrestled free and fled to his car in the apartment complex's parking lot.

Merle drove himself to the hospital and received treatment for non-life-threatening injuries.

Circumstantial evidence linked defendant Farley and co-defendant Martin to the Van Nuys robbery.[1] Two days before

---

[1] Through a plea agreement and factual proffer, Martin admitted (1) to conspiring to commit Hobbs Act robbery with his co-defendants Farley, Williams, Flood, Aristil, and Nattiel; and (2) to participating in the Daytona Beach robbery. In the factual proffers accompanying their guilty pleas, both

24-10954          Opinion of the Court                    9

the robbery, on May 22, 2016, Farley and Martin flew from Orlando to Los Angeles on Frontier Airlines in seats 9D and 9E. The next day—one day before the Van Nuys robbery—Farley rented a silver Nissan Altima with license tag 7LNF268.

In a 911 call made on the day of the robbery, a neighbor reported seeing two black males running with bags of marijuana. The 911 caller saw the robbers talk to someone in a black Mercedes and then enter a silver Nissan with a license tag beginning with "7LNF." Two days later, on May 26, Farley returned the rental car, and Martin flew back to Orlando.

Evidence also tied the unindicted co-conspirator Stephen Arnoux to the Van Nuys robbery. Arnoux flew from Fort Lauderdale to Los Angeles on May 23, 2016—one day before the robbery. Detectives with the Los Angeles Police Department ("LAPD") began investigating Arnoux for possible involvement in the robbery and shooting of William Merle. One detective visited Arnoux in a Los Angeles hospital where Arnoux was being treated for a gunshot wound.

Surveillance footage showed a black Mercedes—like the vehicle the 911 caller saw at the scene of the robbery—dropping Arnoux off at the hospital. LAPD arrested Arnoux but released him shortly thereafter when the district attorney declined to press

Flood and Williams admitted to conspiring to commit and participating in the Keane robbery.

charges due to uncooperative witnesses. Arnoux flew from Los Angeles to Atlanta on June 1, 2016.

While the trial evidence tied Farley to the Van Nuys robbery in California, there was no evidence that defendants Aristil and Nattiel were physically present for the Van Nuys robbery. Throughout the trial, the district court instructed the jury that the Van Nuys robbery was "a robbery that Mr. Aristil and Mr. Nattiel had nothing to do with."

In its final jury charge, the district court also instructed the jury not to consider the Van Nuys robbery to decide whether defendants Aristil and Nattiel were guilty of the charged Hobbs Act robbery conspiracy. In full, the district court told the jury:

> During the trial, you heard evidence of acts allegedly done by the Defendant Palacio Valdes Farley, also known as "Bobo" and "Bo," relating to an alleged robbery on or about May 24th, 2016, in Van Nuys, California. As I previously instructed you, you must not consider this evidence in deciding whether the other two defendants, Aristil and Nattiel, committed the crime charged in the indictment.

B.    **December 5, 2017: The Keane Robbery**

During 2017, Farley bought marijuana from Denzel Wilson. Wilson sold marijuana products he obtained on credit from Stephen Keane in a consignment-like arrangement. Keane testified this type of arrangement was also called "fronting." Keane lived in California and was known as "Moon Man," because he supplied a higher potency weed product called "Moon Rock."

Wilson fell behind on payments owed to Keane and eventually owed Keane $62,000. Wilson blamed buyers in Florida, like Farley, who were not paying for the product Wilson fronted to them.

Keane grew wary of fronting more product to Wilson. In February 2017, Farley, Keane, and Wilson held a meeting at Keane's home in Orange County, California. Farley promised to pay Wilson's debt to Keane. Farley hoped to obtain a large quantity of moon rocks so they all could "make a lot of money."

Farley, however, devised a plan to rob Keane rather than pay him. Farley initially enlisted four of the co-defendants here to carry out the robbery: Nattiel, Aristil, Williams, and Flood. Flood testified that Farley, Nattiel, and Williams discussed the plan in their Miami Beach apartment. By October 2017, Farley had moved to the Miami Beach apartment, where he lived with Samuels, Williams, and Flood. Samuels testified that Nattiel infrequently stayed at the group's apartment.[2]

Farley gave each participant a particular role. Williams would rent a car and drive the team from Miami to California. Flood, who had prior dealings with Keane, would gain access to Keane's house. Several days before the robbery, Farley ensured that Keane would be expecting Flood by telling Keane that he was

---

[2] Flood also testified Aristil was involved in planning the Keane robbery, but he was never physically present in the Miami Beach apartment during the planning stages. Samuels testified that she first met Aristil a couple of months before the Keane robbery.

sending Flood to (1) make good on his promise to pay off Denzel Wilson's debt; and (2) buy a large quantity of marijuana. Defendants Aristil and Nattiel would enter Keane's home and carry out the robbery.

Flood was also tasked with finding an additional participant in California and purchasing handguns for the robbery. Flood obtained burner phones for the group to use to coordinate their cross-country trip. Farley also directed the entire team to switch hotels while in Los Angeles.

The four co-defendants began to carry out Farley's plan. Williams, Flood, and Aristil set out from Miami in a car rented by Williams and picked up Nattiel in Daytona, Florida.[3] The group drove to Los Angeles, where they stayed in a hotel room for the first night. They traveled to Las Vegas the following day to purchase two 9mm handguns. Upon their return to Los Angeles, the team bought zip ties, gloves, black clothing, and ski masks. Analysis of cell tower data showed Flood's phone traveling across the country consistent with Flood's testimony.

On the day of the Keane robbery, Samuels, acting at Farley's direction, joined the four co-defendants—Nattiel, Aristil, Williams, and Flood—in Los Angeles and acquired a second rental car to use

---

[3] Flood testified that she first met Nattiel before the Daytona Beach robbery, when Farley and some of his crew lived in Daytona Beach between January 2017 and April 2017.

in the robbery. The team also picked up another unidentified man to assist in the upcoming robbery.

On the evening of December 5, 2017, co-defendant Williams drove an SUV with Artistil and Nattiel, plus the unidentified man, to Keane's residence. The group had previously removed the license plates from the SUV. Co-defendant Flood drove separately.

Flood knocked on Keane's door and was greeted by Keane. Flood talked to Keane for several minutes but then departed, saying she needed to retrieve something from her car.

Having accomplished her task of gaining access to Keane's home, Flood exited, and defendants Nattiel and Aristil (plus the unidentified man) rushed in with guns drawn. The robbers zip tied Keane's and his wife's hands and feet. One of the robbers dragged Keane to the garage, held a gun to Keane's head, and stated he would make Keane "go night-night" if Keane did not reveal the location of his safe. Keane told the robbers he did not have a safe, and the robbers returned Keane to his wife's side. The robbers proceeded to take large amounts of Keane's marijuana products, jewelry, and watches.

Samuels did not attend the robbery but regrouped with the team when they returned to the hotel.

After the robbers departed, Keane managed to break free and remove the zip ties from his wife. Keane did not call the police, because he did not want law enforcement to discover any remaining drugs or related paraphernalia. However, Keane did need a police report so that he could file an insurance claim for the

stolen jewelry. Keane gathered up any items related to his marijuana business and took them to a friend's house. Keane called the police the next day but falsely reported that his house was burglarized while he and his wife were at the movies.

After the robbery, the group—Flood, Williams, Aristil, Nattiel, and Samuels—completed various tasks such as paying the unidentified man, returning the guns to their contact in Las Vegas, and returning one of the rental cars. Then, the group drove the stolen items back to Miami and delivered them to Farley.

## C.    April 20, 2017: The Daytona Beach Robbery

Over the defendants' objections, the government introduced evidence of another violent robbery involving Farley and co-defendant Martin under Federal Rule of Evidence 404(b).

As of April 20, 2017, Vladimir Gutierrez was a pitcher for the Cincinnati Reds' minor league affiliate located in Daytona Beach, Florida. That day, Gutierrez and his wife, Yanetsi Cordova, ate a pregame lunch at a Latin restaurant in Daytona Beach. As the couple exited the restaurant and headed towards Gutierrez's luxury Mercedes sedan, two black men approached, brandishing guns. One was later identified as Farley; the other was co-defendant Martin. The armed men took Gutierrez's diamond necklace, Rolex watch, wallet, and a bracelet—valuables Gutierrez estimated were worth around $100,000. During the altercation, one of the robbers pushed Cordova to the ground, but she continued to cry for help.

The owner of the Latin restaurant, Luis Escalona, heard the altercation, exited the restaurant, and began shooting at the armed

robbers. Escalona's gunfire injured one robber, and testing later showed that blood found at the scene belonged to Martin. The two robbers fled the scene.

On the same day as the Daytona Beach robbery, Farley called Flood and told her to meet him at a gas station on Interstate 4 heading towards Orlando. Farley wanted Flood to bring a bag of ice. Flood did as she was directed, and Farley and several others arrived at a RaceTrac gas station in an SUV and a black Hyundai Genesis. Martin was shot in the leg, so the group applied ice to the wound. At Farley's direction, the group drove to Robert Benton's house in Orlando, Florida.

The group arrived at Robert Benton's house around 4:15 p.m. or 4:30 p.m. on April 20, 2017. Benton recognized Farley and saw that Martin had a gunshot wound to his leg. After the group transferred Martin to the bed of Benton's pickup truck, Benton and a friend drove Martin to an Orlando-area hospital.

As Benton unloaded Martin at the hospital, Benton told an Orange County Sheriff's Deputy that he found Martin lying on the ground with a gunshot wound and drove him to the hospital. Martin told the same deputy that he was robbed and shot at a local bus stop.

Subsequently, at Farley's direction, co-defendant Williams and unindicted co-conspirator Samuels picked Martin up from the hospital and relocated him to a hotel in Daytona and, then, to Miami.

On April 22, the Daytona Beach Police Department received information from an anonymous 911 caller that suggested a black Hyundai Genesis was connected to the Daytona Beach robbery. Law enforcement located the Hyundai in the early morning hours of April 23. The occupants attempted to flee in their vehicle but crashed. Farley was identified as one of the occupants.

Seemingly to deal with the fallout of the Daytona Beach robbery, Farley took steps to obtain an attorney. In jail calls placed on April 26, Farley directed Flood and others to search for jewelry in the butter at his girlfriend's Daytona Beach house. Flood understood that the jewelry—presumably belonging to Gutierrez—was to be used to pay attorney's fees. Flood took an attorney to the girlfriend's house for purposes of paying the attorney, but Flood was unable to locate the jewelry described by Farley.

Victims Yanetsi Cordova and Luis Escalona both identified Farley as one of the armed robbers. On April 25, 2017, a detective with the Daytona Beach Police Department showed Cordova a lineup with photos of six black men. Cordova initially expressed some hesitancy to select an individual and, in Spanish, remarked that she did not want to select an innocent person. But eventually, Cordova selected the image of Farley and wrote, "this one is the one who looks more like the man" ("este es mas parecido al hombre").

Similarly, on April 26, 2017, Escalona selected the picture of Farley and wrote under the picture, "I'm 50% sure[.]"

Pre-trial, Farley moved to suppress the victims' photo lineup identifications. The district court overruled Farley's objection and admitted the lineups showing the victims' prior identifications.

## D.    Farley's Threat to Lisa Flood

As recounted earlier, co-defendant Flood pled guilty and testified at trial about the Keane and Daytona Beach robberies. The district court also allowed Flood and a correctional officer to testify regarding a threat Farley made to Flood.

The district court admitted Flood's testimony over Farley's objection. Based on the district court's ruling, Aristil and Nattiel moved for their cases to be severed or, in the alternative, for a mistrial. The district court denied their motions for a severance or mistrial. The testimony showed as follows.

In the Federal Detention Center for Miami, Florida, United States Marshals prepare inmates for court appearances in the Receiving and Discharge Department, known as "R&D," for short. Before Flood took the stand for a second consecutive day of testimony, Farley threatened her while the two were in the R&D.

Farley faced Flood and said he was going to kill Flood and her kids. Farley also said, "Bullets have no names." Flood interpreted Farley's threat as an attempt to sway her testimony because Farley knew Flood's kids are a "hotspot" for her and that she would do anything for her kids. During Flood's redirect testimony about the threat, the government asked Flood, "Why are you scared, Ms. Flood?" Flood broke down crying, the district

court sustained Farley's objection, and the government ended its redirect.

The district court instructed the jury to consider the evidence—that Farley had threatened Flood—to determine only "whether the Defendant Farley had a consciousness of guilt about the crime charged in the indictment."

The district court also limited consideration of the threat evidence to only Farley, telling the jury: "As I've previously instructed you, you may not consider the allegations that Defendant Farley tampered with, influenced, or threatened a witness in deciding whether the other two Defendants, Aristil and Nattiel, committed the crime charged in the indictment."

### E.    Rule 29 Motions for Judgments of Acquittal

After the government rested, defendants Farley, Aristil, and Nattiel all separately moved for judgments of acquittal under Federal Rule of Criminal Procedure 29. *See* Fed. R. Crim. P. 29(a).

Only Farley made his motion with any specificity. Farley, through counsel, argued "no real evidence" linked him to the Keane robbery. No evidence placed Farley physically at the scene of the Keane robbery, and Flood's and Samuels' testimony regarding the planning of that robbery differed. Yet, both Flood and Samuels testified Farley planned the robbery and they returned the stolen items to him.

As for the Van Nuys robbery, besides evidence that someone signed Farley's name on a rental car agreement, Farley contended

there was no evidence that Farley was involved in that robbery. Farley pointed out that neither victim William Merle nor any other witness identified Farley as one of the perpetrators of the Van Nuys robbery. As to the Rule 404(b) evidence regarding the Daytona Beach robbery, Farley highlighted how uncertain Cordova and Escalona were when selecting him in the photo lineup.

In contrast to Farley, counsel for Aristil and Nattiel made only general Rule 29 motions. In full, Aristil's counsel stated:

> And at this time, I would move for a judgment of acquittal pursuant to Rule 29 in that a reasonable trier of fact could not find from the record evidence my client guilty beyond a reasonable doubt. And I will not add -- I'll just rest on that. Thank you.

Likewise, counsel for Nattiel stated:

> We move for a judgment of acquittal pursuant to Rule 29 in that there is no competent evidence by which a reasonable jury could convict Mr. Nattiel of the crime with which he is charged.

The district court denied all three Rule 29 motions.

### F.    Verdict and Sentence

The jury found defendants Farley, Aristil, and Nattiel guilty on the single count of conspiracy to commit Hobbs Act robbery. The district court sentenced Farley to 240 months of imprisonment, Aristil to 200 months of imprisonment, and Nattiel to 188 months of imprisonment. The defendants do not appeal their sentences.

The defendants do timely appeal their convictions.

### III.  STANDARDS OF REVIEW

We review *de novo* the sufficiency of an indictment and double jeopardy challenges to an indictment. *United States v. Doak*, 47 F.4th 1340, 1351 (11th Cir. 2022); *United States v. Lee*, 29 F.4th 665, 669 (11th Cir. 2022).

We review the district court's determination that an identification procedure was not unduly suggestive under a clearly erroneous standard. *United States v. Smith*, 967 F.3d 1196, 1203 (11th Cir. 2020).

We review evidentiary rulings under an abuse of discretion standard. *United States v. Akwuba*, 7 F.4th 1299, 1313 (11th Cir. 2021); *United States v. Henderson*, 409 F.3d 1293, 1297 (11th Cir. 2005).

We review the district court's decision not to grant a mistrial for abuse of discretion. *United States v. Baldwin*, 774 F.3d 711, 721 (11th Cir. 2014); *United States v. Newsome*, 475 F.3d 1221, 1227 (11th Cir. 2007).

Generally, we review *de novo* the denial of a motion for a judgment of acquittal based on the sufficiency of the evidence. *United States v. Hano*, 922 F.3d 1272, 1283 (11th Cir. 2019); *United States v. Anderson*, 326 F.3d 1319, 1326 (11th Cir. 2003). "This Court views the evidence 'in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor.'" *Anderson*, 326 F.3d at 1326 (quoting *United*

*States v. Miles*, 290 F.3d 1341, 1355 (11th Cir. 2002)). "But when a defendant challenges the sufficiency of the evidence on a ground not argued before the district court, we review for plain error." *United States v. Al Jaberi*, 97 F.4th 1310, 1322 (11th Cir. 2024).

Ordinarily we review *de novo* whether a material variance occurred between the indictment's allegations and the evidence presented at trial. *United States v. Goldstein*, 989 F.3d 1178, 1198 (11th Cir. 2021) (citing *United States v. Lander*, 668 F.3d 1289, 1295-96 (11th Cir. 2012)). Where a material variance argument is not raised before the district court, however, our review is for plain error. *United States v. Wilson*, 788 F.3d 1298, 1312 (11th Cir. 2015).

## IV. INDICTMENT ISSUES

All three defendants contend the district court erred by denying their motion to dismiss the indictment as impermissibly vague. Farley also argues the district court erred by denying his separate motion to dismiss the indictment pursuant to the Double Jeopardy Clause of the Fifth Amendment.[4] Each of these arguments lacks merit and warrants only brief discussion.

---

[4] On appeal, Aristil states that he adopts Farley's double jeopardy argument. In the district court, Aristil, however, did not join Farley's separate motion to dismiss the indictment on double jeopardy grounds. Aristil, therefore, cannot challenge the denial of Farley's motion on appeal. *See United States v. Wilson*, 894 F.2d 1245, 1251 n.6 (11th Cir. 1990) (concluding a defendant could not challenge denial of a motion he did not join in the district court). Plus, Aristil was not a defendant in Farley's prior drug distribution case, and he never specifies what other case creates a double jeopardy issue as to him. *See United States v. Farley*, No. 19-CR-20667 (S.D. Fla. sentenced July 28, 2022).

For starters, the indictment in this case is not impermissibly vague. The indictment charges a single Hobbs Act robbery conspiracy, tracks the wording of 18 U.S.C. § 1951, and sets forth the essential elements of the crime. The indictment does not stop there. Instead, it incorporates specific factual details, including: (1) the dates of the conspiracy ("on or about May 22, 2016, through on or about December 11, 2017"); (2) the location of the conspiracy ("Southern District of Florida, and elsewhere"); (3) the six conspirators; (4) the property targeted in the robberies ("controlled substances, United States currency, jewelry, and other property"); and (5) the means of accomplishing the robberies ("actual and threatened force, violence, and fear of injury"). This indictment easily passes constitutional muster. *See Doak*, 47 F.4th at 1351-52 ("[A]n indictment is constitutionally sufficient when it 'tracks the wording of the statute, as long as the language sets forth the essential elements of the crime.'" (quoting *United States v. Wayerski*, 624 F.3d 1342, 1350 (11th Cir. 2010))); *see also United States v. Yonn*, 702 F.2d 1341, 1348 (11th Cir. 1983) ("[A]n indictment for conspiracy to commit a criminal offense need not be as specific as a substantive count." (quoting *United States v. Ramos*, 666 F.2d 469, 475(11th Cir. 1982))).

The indictment also does not expose Farley to double jeopardy in violation of the Fifth Amendment. As the district court rightly concluded, Farley could be punished for both (1) his prior drug conspiracy conviction under 21 U.S.C. §§ 841(a)(1), 846; and (2) the current Hobbs Act robbery conspiracy conviction under 18 U.S.C. § 1951(a). *See United States v. Cannon*, 987 F.3d 924, 940 (11th

24-10954          Opinion of the Court          23

Cir. 2021). A Hobbs Act robbery conspiracy under 18 U.S.C. § 1951(a) requires, among other elements, proof that "two or more persons agreed to commit a robbery encompassed within the Hobbs Act." *Id.* (quoting *Hano*, 922 F.3d at 1294). A drug conspiracy under 21 U.S.C. § 841(a)(1) requires, among other elements, an agreement to possess with intent to distribute a controlled substance. *Id.* The two conspiracies satisfy the *Blockburger* test by having separate elements and requiring "'proof of a fact which the other does not'—namely, a distinct type of agreement." *Id.* (quoting *Blockburger*, 284 U.S. at 304). Farley's convictions in his § 841 case and this § 1951 case thus do not violate the Fifth Amendment's Double Jeopardy Clause.

## V. MOTION TO SUPPRESS THE PHOTO LINEUP IDENTIFICATION

Farley argues that the district court erred by denying his motion to suppress the identifications made by Yanetsi Cordova and Luis Escalona based on the photo lineup after the Daytona Beach robbery.[5]

Farley's motion contended the identification procedures used were "unnecessarily suggestive." The government opposed the motion. The district court conducted an evidentiary hearing and made specific findings.

---

[5] On appeal, Aristil tries to join Farley's argument regarding the photo lineup identifications. Because Aristil did not join Farley's motion to suppress the identifications filed in the district court, Aristil cannot challenge them on appeal. *See Wilson*, 894 F.2d at 1251 n.6.

A.    **Evidentiary Hearing**

At an evidentiary hearing, Detective David Dinardi testified that he interviewed Vladimir Gutierrez, Yanetsi Cordova, and Luis Escalona during his investigation of the Daytona Beach robbery. Escalona, who had exited the Latin restaurant and fired upon the robbers, described the robbers as two black males. One was around six feet tall with a medium build and was wearing a blue or black hoody. The other was around five feet two inches tall and chubby.

Cordova, who was pushed to the ground as her husband was robbed, told Detective Dinardi the robber in the black hoody had gold teeth. Based on his investigation, Detective Dinardi created a photo lineup of Farley and five other black men by using jail booking photos.

On April 25, 2017, Cordova viewed the photo lineup and the Daytona Beach Police Department recorded the interview. When presented with the lineup, Cordova began by selecting the picture of Farley and saying: "I'm not sure. . . . I think this is the one that most resembles him." Detective Dinardi tried to clarify by asking, "Are you saying it's that one or does it look like him?" Cordova responded, "He looks like [him]." Some of Cordova's hesitation seemed to be caused by her inability to see Farley's teeth in the lineup photo. She remarked, "I don't know what . . . what his teeth were like."

Detective Dinardi then asked Cordova if she could assign a percentage to her certainty that the selected individual was one of her assailants, but he added, "If you can say; otherwise, don't."

Cordova continued to express her hesitancy and said she did not want to pick someone who was innocent. Before Detective Dinardi said anything besides "okay," Cordova said, "This is the one who looks more like him." Detective Dinardi directed Cordova to initial below the picture she had selected and write "most like him." Cordova initialed below Farley's picture and wrote: "this one is the one who looks more like the man" ("este es mas parecido al hombre").

On April 26, 2017, Detective Dinardi presented the lineup to Luis Escalona. Detective Dinardi traveled to Luis Escalona's restaurant, where Escalona viewed the photo lineup. Escalona selected the picture of Farley and, underneath Farley's picture, wrote, "I'm 50% sure."

On cross-examination, Farley's counsel asked Detective Dinardi whether he could see a gold tooth in Farley's lineup photo. Detective Dinardi said: "There appears to be something in his mouth. Uhm, kind of looks white, uhm . . . ." Even when pressed further, Detective Dinardi testified that he only saw a "little piece of white."

B.    District Court's Rulings

After the evidence ended, Farley made these arguments. Although government records listed every individual in the lineup as African-American, Farley argued "there are different shades of African-Americans, and two out of the six are clearly different than the other four." Next, Farley pointed out that he was the only individual in the lineup with a gold tooth visible.

The district court rejected Farley's arguments and found Cordova's and Escalona's identifications on the photo array were admissible. The district court properly applied this Circuit's two-step inquiry for whether an out-of-court identification is admissible. The district court examined (1) whether the identification procedure was unduly suggestive; and, if the lineup was unduly suggestive, (2) whether the identification was nonetheless reliable under the totality of the circumstances. *See Smith*, 967 F.3d at 1203; *see also Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

At step one, the district court found nothing about the size of the photo array, the manner of its presentation, or the details of the photographs in the array made it unduly suggestive. *See Smith*, 967 F.3d at 1203 (citations omitted) (listing factors to determine whether array is unduly suggestive). The district court concluded that the law did not require every member of a photo lineup to have the same skin tone. And, the district court found that the six men in the photo array were all bald, black men of similar complexion, stating:

> In any event, I was actually surprised, pleasantly surprised, by how fair the array was. Six men, all black, all African-American on their DAVID records, all bald, all of a similar if not identical complexion.

As for Farley's gold tooth argument, the district court found it was impossible to identify the object in Farley's mouth. The district court found Farley's gold teeth were not visible in the photo lineup:

[T]he point that was made for the first time today, is that the focus of the witness was on her -- on the gold teeth of the assailant, and that Mr. Farley's photo was the only one with gold teeth. Well, that's just not true. Looking at the photos, and as the witness credibly testified, there's nothing gold about the thing in Mr. Farley's mouth. . . . Whether that's a tooth, a white tooth, a gold tooth, it's impossible to say.

In any event, it's only a tiny part of one tooth. It is so indiscernible and irrelevant to the photo itself that the prosecutor totally missed it, the witness totally missed it, the defense lawyer preparing the suppression motion totally missed it, and the judge didn't notice it at all . . . .

The district court thus found that Farley's motion failed at step one and the out-of-court identifications were admissible.

Even if the identification procedures were arguably unduly suggestive, the district court found it would admit the identifications as reliable under the second step of the admissibility inquiry. The district court noted that the police did not make the victims "overreach" and the victims "were careful not to inculpate an innocent person and gave relatively low percentages for their identification."

## C.    Discussion

We readily conclude Farley has shown no error in (1) the district court's finding that the photo identification procedure was

not unduly suggestive; (2) its admission of the photo lineup identifications; and (3) its denial of Farley's motion to suppress.

In reviewing whether the photo lineup or its presentation was unduly suggestive, we look to "the size of the array, the manner of its presentation, and the details of the photographs in the array." *Smith*, 967 F.3d at 1203; *United States v. Daniels*, 97 F.4th 800, 809 (11th Cir. 2024). As the district court found, nothing about the array or the police presentation made the array or the procedure unduly suggestive. Rather, all six photos were of similar-looking bald, black men. The record also supports the district court's finding the two victims' identifications were reliable under the totality of the circumstances. There was no error, much less clear error, in the district court's findings; and no error in the district court's denial of Farley's motion to suppress.

## VI. ADMISSION OF DAYTONA BEACH ROBBERY EVIDENCE

Defendants Farley, Aristil, and Nattiel contend that the district court abused its discretion by admitting evidence of the Daytona Beach robbery under Rule 404(b). In a pre-trial motion in limine, the defendants objected to the admission of that evidence.

At the beginning of trial, the district court stated its view that evidence of that robbery was admissible as (1) substantive evidence of the conspiracy; and (2) Rule 404(b) evidence of Farley's intent to commit Hobbs Act robbery, Farley's relationship with his co-conspirators, and Farley's role as leader of the conspiracy.

Later during trial—but still before the jury heard specific testimony about the Daytona Beach robbery—the district court limited consideration of the Daytona Beach robbery evidence to only Rule 404(b) purposes.

## A.    Court's Limiting Instruction

Before admitting evidence of the Daytona Beach robbery, the district court gave a limiting instruction. Before victim Luis Escalona took the stand to describe the Daytona Beach robbery, the district court instructed the jury that the evidence (1) was admitted for the limited purpose of showing defendant Farley's intent and relationship with his co-defendants, and (2) was not to be considered "at all" as to defendants Aristil and Nattiel. The district court's jury instruction in full was:

> Folks, you're about to hear evidence of acts allegedly done by one defendant on an occasion that may be similar to acts with which the defendant is currently charged. You must not consider this evidence to decide whether the defendant engaged in the activity alleged in the indictment. This evidence is admitted and may be considered by you for the limited purpose of assisting you in determining whether the defendant had the state of mind or intent necessary to commit the crime charge[d] in the indictment, or whether the defendant had a relationship with people who are codefendants of his in the indictment, and whether the defendant knew those people and acted together with them. So that is my limiting instruction for you.

> When I talk about "the defendant," with respect to this limiting instruction, I'm talking about Mr. Farley. Again, with respect to this evidence, there's no allegation that either Mr. Aristil or Mr. Nattiel had anything to do with it. So you're not allowed to consider it as against the two of them at all.

Importantly too, the district court gave a version of this limiting instruction (1) at various points throughout the trial, and (2) in its closing jury instructions. The district court also allowed the jury to take its closing instructions to the jury room.

## B.    Discussion

For multiple reasons, we conclude that the district court did not abuse its discretion in admitting the Rule 404(b) evidence of the Daytona Beach robbery as to defendant Farley.

Evidence of a defendant's "other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But, among other permissible purposes, such evidence may be admitted to prove a defendant's intent. Fed. R. Evid. 404(b)(2). To be admissible, other acts evidence "must satisfy a three-part test: '(1) it must be relevant to an issue other than defendant's character; (2) there must be sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; and (3) . . . the evidence must satisfy Rule 403.'" *United States v. Cenephat*, 115 F.4th 1359, 1365 (11th Cir. 2024) (quoting *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007)).

The Daytona Beach robbery evidence satisfied all three prongs. First, the evidence was relevant for a permissible purpose and was not offered as character evidence. Farley's participation in the Daytona Beach robbery and related evidence showed (1) his intent to conspire to commit robberies on other occasions; (2) Farley's criminal relationships with his co-defendants; and (3) Farley's role as the leader who directs his co-conspirators. These purposes are sufficient to satisfy the first prong of our Rule 404(b) inquiry.

Second, the evidence allowed a reasonable jury to conclude Farley had committed the Daytona Beach robbery. The jury received evidence that (1) two witnesses—Yanetsi Cordova and Luis Escalona—identified Farley as one of the robbers; (2) Farley ordered Flood and Samuels to assist with the aftermath of the Daytona Beach robbery; and (3) law enforcement found Farley in a vehicle tied to the Daytona Beach robbery. This evidence was more than sufficient to satisfy the second prong of our Rule 404(b) inquiry.

Third, turning to Rule 403, the probative value of the Daytona Beach robbery evidence was not substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403. Farley put his intent at issue when he pled not guilty. *See United States v. Matthews*, 431 F.3d 1296, 1311 (11th Cir. 2005) (stating that "[i]n every conspiracy case, . . . . a not guilty plea renders the defendant's intent a material issue" (quoting *United States v. Roberts*, 619 F.2d 379, 383 (5th Cir. 1980)). The Daytona Beach robbery,

which occurred within the duration of the conspiracy set out in the indictment, provided contemporaneous evidence of Farley's intent to conspire to commit other Hobbs Act robberies. Any unfair prejudice possibly attributable to this highly probative evidence was mitigated by the district court's limiting instructions, which told the jury (1) to consider the evidence as only evidence of Farley's intent or relationship with his co-conspirators; and (2) not to consider the evidence against Aristil and Nattiel. Rule 403 did not bar admission of this evidence.

## VII.    ADMISSION OF FARLEY'S THREAT AGAINST LISA FLOOD

Defendants Farley, Aristil, and Nattiel argue that the district court erred under Rule 404(b) by admitting evidence from Flood and a correctional officer—that defendant Farley threatened Flood. We disagree for several reasons.

To begin, the district court properly found Farley's threat (1) would not be offered to show Farley's bad character; but (2) could demonstrate the "consciousness of guilt" of the defendant—a purpose for which various courts had admitted threats against witnesses under Rule 404(b). *See United States v. Fey*, 89 F.4th 903, 910-11 (11th Cir. 2023) ("Our precedent treats threats against a witness as evidence of consciousness of guilt and applies Rule 404(b)."); *United States v. Gonzalez*, 703 F.2d 1222, 1223 (11th Cir. 1983).

Next, the district court found a reasonable jury could conclude the threat was made by Farley because both a

24-10954              Opinion of the Court                    33

correctional officer and Flood would testify the threat was made. *See United States v. Brazel*, 102 F.3d 1120, 1153-54 (11th Cir. 1997) (affirming district court's decision that a reasonable jury could find threat was made where another witness corroborated threat testimony).

Significantly also, the district court conducted the proper Rule 403 balancing test—determining the extreme probative value of the threat evidence was not substantially outweighed by unfair prejudice. *See* Fed. R. Evid. 403. The district court found, *inter alia*, that (1) the threat occurred recently; (2) the court would provide limiting instructions; and (3) the threat was "extremely probative on the question of the defendant's consciousness of guilt . . . ." Therefore, the district court ruled that testimony regarding Farley's threat against Flood was admissible under Rules 404(b) and 403.

Finally, the district court gave limiting instructions four times: (1) before the correctional officer's testimony; (2) before Flood testified; (3) after Flood testified; and (4) in its closing instructions. The testimony was emotional, but the government ended its examination when Flood began to cry.

For all these reasons, the defendants have not shown the district court abused its discretion in admitting the threat evidence. Aristil and Nattiel also have shown no abuse of discretion in the district court's denials of their motions for a severance or mistrial.[6]

---

[6] Nattiel suggests the district court should have polled the jury regarding whether they could follow the district court's instruction not to consider

24-10954                 Opinion of the Court                    34

### VIII.   ARISTIL'S RULE 29 MOTION

To place this Rule 29 issue in proper context, we outline Aristil's arguments on appeal and the government's response.

### A.    Aristil's Arguments on Appeal

On appeal, Aristil argues that the government's evidence "established that two robberies were committed in California, in 2016, and in 2017, but failed to establish that the two robberies were part of the single conspiracy to commit robberies charged in the indictment." He portrays the Van Nuys robbery and Keane robbery as separate conspiracies. Aristil highlights that (1) the two robberies involved different participants; (2) no evidence connected him to the Van Nuys robbery; and (3) no testimony suggested Aristil was involved with any events in this case until October or November of 2017—over a year after the Van Nuys robbery in 2016. Thus, Aristil says the government introduced insufficient evidence to support his conviction on the single conspiracy charged in the indictment.

Although Aristil primarily frames his argument as a sufficiency-of-the-evidence challenge, the substance of his argument on appeal is also one of variance. Under our precedent, "[a] material variance between an indictment and the government's proof at trial occurs if the government proves multiple conspiracies under an indictment alleging only a single conspiracy." *United States v. Castro*, 89 F.3d 1443, 1450 (11th Cir. 1996) (citing *Kotteakos v.*

---

Farley's threat against Aristil and Nattiel. No party requested a poll when the instructions were given, and Nattiel cites no case requiring such polling.

*United States*, 328 U.S. 750 (1946)). We also have described the issue of variance between indictment and trial evidence as "one form of challenge to the sufficiency of the evidence." *United States v. Jenkins*, 779 F.2d 606, 616 (11th Cir. 1986); *Lander*, 668 F.3d at 1295.

However framed, Aristil (1) repeatedly argues the evidence did not show he joined a single, overarching conspiracy involving two robberies (Van Nuys and Keane robberies); and (2) cites multiple conspiracy cases that analyze whether a material variance occurred between an indictment and the evidence at trial. On this latter point, the text of Aristil's opening brief cites these material variance cases: *United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004); *United States v. Huff*, 609 F.3d 1240 (11th Cir. 2010); *United States v. Edouard*, 485 F.3d 1324 (11th Cir. 2007).

What's more, Aristil actually uses "material variance" language in a footnote of his opening brief, albeit only highlighting the differences between a "two robbery" conspiracy (Van Nuys and Keane) versus a "three robbery" conspiracy (Van Nuys, Keane, and Daytona Beach) as follows:

> Conceivably, because of the difference between a "two robbery" and a "three robbery" conspiracy, a material variance occurred, and, accordingly, a mistrial should have been declared after opening statements. *Cf.* . . . *Richardson v. United States*, 526 U.S. 813, 820 (1999) ("We would not permit . . . an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday.") (quoting

> *Schad v. Arizona* 501 U.S. 624, 651 (1991) (Scalia, J., concurring)).

In a responsive footnote on appeal, the government argues Aristil's material variance point is "too undeveloped to support relief." Indeed, after opening statements, the district court decided that evidence of the Daytona Beach robbery would be admitted for only Rule 404(b) purposes.

At bottom, most of Aristil's textual briefing argues that the government failed to show that the two Van Nuys and Keane robberies were part of a single conspiracy, which is also a quintessential material variance argument. *See Castro*, 89 F.3d at 1450 (stating that material variance occurs when the indictment charges one conspiracy but the evidence shows multiple conspiracies). Aristil's overall sufficiency argument on appeal is, at its core, about both (1) the sufficiency of the evidence; and (2) the differences between the indictment and the proof at trial. Aristil drives that point home at the end of his argument by stating: "In sum, the evidence failed to establish the single conspiracy charged in the [i]ndictment."

## B.    Government's Response

In response the government argues that the evidence proved "that Farley and his named co-conspirators—Aristil, Nattiel, Martin, Flood, and Williams—worked toward a common goal: stealing marijuana for Farley's drug organization to sell at a 100 percent profit." Even assuming Aristil joined the conspiracy to further that goal at a later time, that fact did not split one

conspiracy into two. Both robberies had overlapping participants because Farley was central to both. Farley's position as a "key man" who "directs and coordinates the activities and individual efforts of various combinations of people" meant the jury could find a single conspiracy. *United States v. Richardson*, 532 F.3d 1279, 1284-85 (11th Cir. 2008) (quoting *Edouard*, 485 F.3d at 1347); *Anderson*, 326 F.3d at 1327. In other words, there was only one conspiracy, not two conspiracies and a variance.

## C.    *De Novo* or Plain Error Review

Despite all this, a threshold question remains over what standard of review applies to Aristil's Rule 29 claims on appeal. In the district court, Aristil's Rule 29 motion did not argue that the evidence failed to show he joined a single, overarching conspiracy—whether that argument is cast in variance or sufficiency-of-the-evidence terms. At best, when the government rested, Aristil's Rule 29 motion for a judgment of acquittal made only a general challenge when it asserted that "a reasonable trier of fact could not find from the record evidence [Aristil] guilty beyond a reasonable doubt."

Aristil cites our decision in *United States v. Baston* to contend that *de novo* review applies. Aristil argues that under *Baston* a defendant preserves all challenges to the sufficiency of the evidence if he raises a general challenge in the district court. 818 F.3d 651, 653-54 (11th Cir. 2016). The government does not argue otherwise.

Both parties, however, ignore our precedent in this area and misread *Baston*. When a defendant moves for judgment of acquittal

24-10954                Opinion of the Court                    38

under Rule 29 based on insufficiency of the evidence but does not make the specific argument in the Rule 29 motion that he makes on appeal, the Court on appeal reviews that argument only for plain error. *United States v. Zitron*, 810 F.3d 1253, 1260 (11th Cir. 2016);[7] *United States v. Joseph*, 709 F.3d 1082, 1093 (11th Cir. 2013); *see also United States v. Gomez Rivera*, 136 F.4th 1284, 1290 (11th Cir. 2025) ("We review for plain error unpreserved objections to the sufficiency of the evidence." (citations omitted)); *United States v. Straub*, 508 F.3d 1003, 1010-11 (11th Cir. 2007).

In *Baston*, this Court also applied plain error review. 818 F.3d at 664. In the district court, Baston's Rule 29 motion "challenged the sufficiency of the evidence 'on the indictment as a whole.'" *Id.* But Baston "challenged the 'whole' indictment by raising *specific* arguments against each count." *Id.* In the district court, "Baston argued that he did not force [the victim] into prostitution; he did not argue that his conduct was not 'in or affecting' commerce." *Id.* This Court applied plain error review to his interstate commerce argument because: "When a defendant raises specific challenges to the sufficiency of the evidence in the district court, but not the specific challenge he tries to raise on appeal, we review his argument for plain error." *Id.* (citing *Joseph*, 709 F.3d at 1103; *Straub*,

---

[7] In *Zitron*, in the district court, the defendant made a Rule 29 motion based on insufficient evidence, but, on appeal, he argued there was insufficient evidence that he knowingly acted without lawful authority when he took out credit cards in his son's name. *Zitron*, 810 F.3d at 1260. Because he did not make the specific argument in his Rule 29 motion that he made on appeal, this Court applied plain-error review. *Id.*

508 F.3d at 1011; *United States v. Hunerlach*, 197 F.3d 1059, 1068 (11th Cir. 1999)).[8]

Notably too, after *Baston*, this Court decided *United States v. Tovar*, where the defendant in the district court moved for a judgment of acquittal, arguing that "the government did not prove that he knowingly enticed or solicited the underage girls." *United States v. Tovar*, 146 F.4th 1318, 1322 (11th Cir. 2025). But on appeal, the defendant argued the government did not prove that his conduct was "in or affecting interstate commerce." *Id.* (internal quotation marks omitted). We held our review as to the interstate commerce argument was for plain error since the defendant "did not raise the issue in the district court." *Id.* at 1325. In doing so, we noted that the defendant alternatively argued that a "general" challenge to the adequacy of the evidence in the district court preserved his specific argument for *de novo* review. *Id.* at 1325 n.3. The *Tovar* Court rejected that alternative argument, stating, "Our Circuit has never adopted that rule, and we decline to do so today." *Id.*

Here, defendant Aristil's Rule 29 motion in the district court raised only a general challenge to the sufficiency of the evidence and did not specifically argue that the government's evidence failed

---

[8] The *Baston* Court did note that other circuits had held that "a defendant preserves all challenges to the sufficiency of the evidence if he raises a 'general' challenge in the district court." *Baston*, 818 F.3d at 663-64. But, the *Baston* Court concluded we "need not decide" if those decisions are consistent with our current law "because Baston did not raise a 'general' challenge to the sufficiency of the evidence." *Id.* at 664. So, *Baston* does not help Aristil.

24-10954               Opinion of the Court                    40

to show a single, overarching conspiracy. Therefore, we need to review the single conspiracy argument on appeal only for plain error.

Nonetheless, we conclude that, no matter our standard of appellate review, Aristil has shown no error, plain or otherwise. We explain why.

D.     **Sufficient Evidence of a Single Conspiracy**

Sufficient evidence was presented at trial for a reasonable juror to conclude that the two robberies were part of a single conspiracy. In determining whether a single conspiracy exists, we generally consider three factors: (1) "whether a common goal existed," (2) "the nature of the underlying scheme," and (3) "the overlap of participants." *United States v. Dixon*, 901 F.3d 1322, 1335 (11th Cir. 2018) (quoting *Richardson*, 532 F.3d at 1284). All three factors weigh in favor of the verdict finding a single conspiracy.

First, the Van Nuys and Keane robberies had a common goal: to steal marijuana from drug dealers to further Farley's drug dealing activity. *See United States v. Moore*, 525 F.3d 1033, 1042 (11th Cir. 2008) ("Courts typically define the common goal element as broadly as possible," with "common" being "defined as 'similar' or 'substantially the same.'"), *abrogated on other grounds by*, *McDonnell v. United States*, 579 U.S. 550, 552 (2016). It was reasonable to infer that Nattiel and Aristil understood and intentionally acted to further this common goal. During the Keane robbery, they stole the drugs, packaged them, and brought them back to Farley—who was "surprised" when they drove it rather than shipped it back

because it was a deviation from the plan. This is exactly the same goal as the Van Nuys robbery—both were undertaken to support Farley's drug dealing business. And because Aristil and Nattiel "facilitated the endeavors of other coconspirators, *or facilitated the venture as a whole*[,] . . . a single conspiracy is shown." *Chandler*, 388 F.3d at 811 (quoting *United States v. Powell*, 982 F.2d 1422, 1429 (10th Cir. 1992)); *see also Dixon*, 901 F.3d at 1335 ("It is important to note that 'separate transactions are not necessarily separate conspiracies, so long as the conspirators act in concert to further a common goal.  If a defendant's actions facilitated the endeavors of other co-conspirators, or facilitated the venture as a whole, a single conspiracy is established.'" (quoting *Richardson*, 532 F.3d at 1284)).

Second, the nature of the scheme in the Van Nuys and Keane robberies was similar. In both robberies, the participants robbed drug suppliers who refused to give drugs away on consignment. Both robberies proceeded the same way: they started as normal drug deals, one conspirator would leave, the gunmen would rush in to conduct an armed robbery and steal drugs and whatever else the drug dealer had on his person. Both involved conspirators renting cars and using those cars for the robbery and getaway. And both ended with the drugs in Farley's possession *See United States v. Seher*, 562 F.3d 1344, 1367 (11th Cir. 2009) (finding that the use of "set patterns and practices" over multiple underlying criminal acts "show the commonality of purpose expected of a single conspiracy").

Third, there were overlapping members. Of course, Farley was the "key man" who "direct[ed] the activities, coordinating the

individual efforts of various combinations of people," which we've said can be enough to show a single conspiracy. *Anderson*, 326 F.3d at 1328 (citing *United States v. Taylor,* 17 F.3d 333, 337 (11th Cir. 1994)); *see also Edouard*, 485 F.3d at 1347 (citing *Anderson*, 326 F.3d at 1327-28). But Farley wasn't the only tie between the participants—they were all intertwined and interdependent. *See Anderson*, 326 F.3d at 1327 (finding that a single conspiracy existed where there was "substantial overlap" between participants even though "the participants were different in each" underlying criminal act); *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998) ("The government must show an 'interdependence' among the alleged co-conspirators in order to prove that the indicted conspiracy was a single unified conspiracy as opposed to a series of smaller, uncoordinated conspiracies."). Williams, who was involved in the robbery with Nattiel and Aristil, called Martin, who was involved in the robbery without Nattiel and Aristil, her son. So did Farley. Farley, Flood, Williams, and Samuel lived together for periods of time. Samuels testified that sometimes Nattiel would stay there too. Farley dated both Flood and Williams. According to Samuels, Williams was like a mother to her. And Samuels testified that she was in a "complicated" sexual relationship with Aristil, whom she met through Farley a "couple months" before the Keane robbery. Wilson—a victim of the robbery in which Nattiel and Aristil were involved—testified that he had previously met Farley, Martin, and Arnoux—the robbers of the robbery in which Nattiel and Aristil were not involved—before. This is enough to show a

"substantial overlap" sufficient to support a single conspiracy. *See Anderson*, 326 F.3d at 1327.

In sum, under our precedents, the trial evidence sufficiently showed that the Van Nuys and Keane robberies were part of a single conspiracy because (1) all the participants in the Keane robbery understood that the goal was to rob drug dealers of drugs to give to Farley, which was the same goal as the Van Nuys robbery; (2) the two robberies were carried out the same way, and (3) the robberies involved overlapping, intertwined, and interdependent members who were also linked by a single key man—Farley. This is far from the "rimless wheel" described in *Kotteakos* and *Chandler*, "where the 'spokes' of a conspiracy have no knowledge of or connection with" the other "spokes" and "deal[ ] independently with the hub conspirator" resulting in "as many conspiracies as there are spokes." *Chandler*, 388 F.3d at 807; *Kotteakos*, 328 U.S. at 755.

## E.      Material Variance Discussion

Alternatively, even if the evidence was insufficient to prove a single conspiracy, that yielded, at worst, a variance that does not require reversal.

This Court "will not reverse a conviction because a single conspiracy is charged in the indictment while multiple conspiracies may have been revealed at trial unless the variance is [1] material and [2] substantially prejudiced the defendant." *Richardson*, 532 F.3d at 1284 (quoting *Edouard*, 485 F.3d at 1347). A variance is not material where, "viewing the evidence in the light most favorable to the government, a rational trier of fact could have found that a

single conspiracy existed beyond a reasonable doubt." *Edouard*, 485 F.3d at 1347 (quoting *United States v. Suarez*, 313 F.3d 1287, 1289 (11th Cir. 2002)).

Even if a material variance occurred, the variance requires reversal only if the defendant can show "substantial prejudice" resulted. *Richardson*, 532 F.3d at 1286-87; *Edouard*, 485 F.3d at 1347. A defendant can demonstrate substantial prejudice by showing:

> 1) that the proof at trial differed so greatly from the charges that [he] was unfairly surprised and was unable to prepare an adequate defense; *or* 2) that there are so many defendants and separate conspiracies before the jury that there is a substantial likelihood that the jury transferred proof of one conspiracy to a defendant involved in another.

*Richardson*, 532 F.3d at 1286-87 (quoting *Calderon*, 127 F.3d at 1328).

As to Aristil, the material variance would be that (1) the indictment charged one conspiracy; (2) the trial evidence proved two separate conspiracies—the Van Nuys robbery and the Keane robbery; and (3) Aristil joined only a conspiracy to carry out the Keane robbery.

Even assuming *arguendo* that this material variance occurred, we conclude that Aristil suffered no "substantial prejudice" and thus can show no error supporting reversal of his conviction. Multiple reasons support our conclusion.

First, any material variance that occurred did not result in the proof at trial differing so greatly from the charge in the

indictment that Aristil could have been "unfairly surprised" and "unable to prepare an adequate defense." *Id.* Instead, the trial evidence closely conformed to the indictment's language. The indictment charged the defendants with conspiring to commit Hobbs Act robbery from May 22, 2016, through December 11, 2017, all in an effort to "take controlled substances, United States currency, jewelry, and other property." The evidence showed two Hobbs Act robberies, targeting those controlled substances and valuables, and carried out by Farley and his co-conspirators during the charged time frame. Aristil could not have been unduly surprised by this evidence.

Second, the evidence did not involve "so many defendants and separate conspiracies" such that there was "a substantial likelihood that the jury transferred proof of one conspiracy to a defendant involved in another." *Id.* at 1287. Even supposing this case, which was charged as a single conspiracy, morphed into a case with two conspiracies involving the defendants here, the variance did not present the same risk of confusing the jury that has supported finding a defendant suffered prejudice. *See Kotteakos*, 328 U.S. at 766 (finding substantial prejudice resulted from variance where, instead of a single conspiracy, evidence showed eight conspiracies involving thirty-two defendants); *United States v. Chandler*, 388 F.3d 796, 799, 802 n.9, 812 (11th Cir. 2004) (finding prejudicial variance in case with forty-three defendants and fifty transactions in furtherance of the conspiracy).

The district court also ensured proof of the Van Nuys robbery would not be transferred to Aristil by instructing the jury not to consider the Van Nuys robbery evidence against Aristil and Nattiel. *See supra* Section II.A. We presume the jury followed this instruction, which protected Aristil from being "swept into [a] conspiratorial net" of which he was not a part. *Chandler*, 388 F.3d at 798; *Samia v. United States*, 599 U.S. 635, 646 (2023) (noting we presume the jury follows trial court's instructions). Indeed, the district court also told the jury not to consider the Daytona Beach robbery evidence against Aristil and Nattiel. *See supra* Section VI.A. Those instructions helped ensure the jury could return a guilty verdict against Aristil based only on the Keane robbery evidence, which was overwhelming as to Aristil's participation.

Third, the government charged and amply proved as to Aristil all elements of the crime of conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a). Aristil traveled across the country with several of his co-defendants and participated in the violent Keane robbery. That the evidence may have shown a conspiracy narrower in scope than the one charged does not necessarily result in prejudice. "It is sufficient for the government to prove a subset of the allegations in the indictment, as long as the allegations that are proved support a conviction for the charged offense." *Richardson*, 532 F.3d at 1288-89 (citations omitted); *see also United States v. Davis*, 679 F.2d 845, 851-52 (11th Cir. 1982) (finding no prejudice where evidence at trial "showed a conspiracy with fewer people, of shorter duration, and in a smaller area" than the charged conspiracy). The elements of the charged

crime—a conspiracy to commit Hobbs Act robbery—do not require more than one robbery and were all proven as to Aristil.

In sum, even assuming a material variance occurred, Aristil has not shown prejudice, much less substantial prejudice, and no reversible error occurred.

## IX.  FARLEY'S AND NATTIEL'S RULE 29 MOTIONS

In their briefs on appeal, Farley and Nattiel did not raise a Rule 29 sufficiency-of-the-evidence argument or a variance claim. Both do attempt to adopt Aristil's Rule 29 arguments. But "sufficiency arguments are too individualized to be generally adopted." *United States v. Cooper*, 203 F.3d 1279, 1285 n.4 (11th Cir. 2000) (declining to consider sufficiency-of-the-evidence argument adopted by appellant); *see also United States v. Holt*, 777 F.3d 1234, 1260 n.17 (11th Cir. 2015). Nevertheless, we explain why both Farley and Nattiel also have shown no error requiring reversal of their convictions.

Farley is easy. As the conspirators' leader, Farley was involved in every robbery described in this case. There was no material variance between the single conspiracy indictment and proof at trial as to Farley.

Nattiel is arguably more like Aristil. But, as outlined above, there was trial evidence connecting Nattiel more to Farley and his co-conspirators during a timeframe closer to the Van Nuys robbery. For the same reasons articulated above as to Aristil, we conclude the government presented sufficient evidence that the

Van Nuys and Keane robberies were part of a single conspiracy as to Nattiel.

Alternatively, even assuming *arguendo* a material variance occurred as to Nattiel, there was overwhelming evidence of Nattiel's participation in the violent Keane robbery. For the same reasons as to Aristil, Nattiel has not shown he suffered substantial prejudice from any material variance that occurred.

## X.  CONCLUSION

We **AFFIRM** the convictions of Farley, Aristil, and Nattiel.

**AFFIRMED.**